James H. Hohenstein
Christopher R. Nolan
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
Tel:    (212) 513-3200
Fax:    (212) 385-9010
E-mail:  jim.hohenstein@hklaw.com
        chris.nolan@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff
*Fouquet Sacop S.A.*



JUDGE KAPLAN

'09 CIV    7501

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOUQUET SACOP S.A.,

          Plaintiff,

        -against-

YARDIMCI GEMI INSA A.S.,

          Defendant.

09 CV _____ (    )

**VERIFIED COMPLAINT**

    Plaintiff Fouquet Sacop S.A. ("Plaintiff" or "Fouquet"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Yardimci Gemi Insa A.S., ("Yardimci") alleges as follows:

    1.    This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. At all times material herein, plaintiff Fouquet was and is a business entity organized and existing under the laws of France with a registered office at 112, boulevard des Dames, 13002 Marseille, France.

3. Upon information and belief, at all material times herein, defendant Yardimci was and is a business entity organized under the laws of the Republic of Turkey with a registered office at Aydintepe Mahallesi, Tersaneler Caddesi 50, Sokak No. 7, 81700 Tuzla, Istanbul, Turkey.

4. On December 17, 2003, Fouquet and Yardimci entered into a contract ("Contract"). Pursuant to the terms of the Contract, Yardimci undertook to build one tank vessel for the carriage of molten sulphur, asphalt or bitumen (the "FS Charlotte" or the "Vessel") and Fouquet undertook to purchase the Vessel. A true and correct copy of the relevant pages of the Contract is attached hereto as Exhibit 1.

5. Pursuant to the Contract, Yardimci delivered the Vessel to Fouquet on or about March 2, 2006.

**Fouquet's First Cause of Action for**
**Breach of Warranty of the Reduction Gear**

6. Pursuant to Article IX.1 of the contract, Yardimci guaranteed "all the propulsion equipments (main engine, reduction gear, shaft line and CPP) for a period of thirty-six (36) months as from the Actual Delivery Date. Any wear and tear within the design criteria will be for [Fouquet's] account after the first one year guarantee."

7. On May 23, 2008, while the Vessel was plying its trade on a voyage from Jorf Lasfar, Morocco to Bayonne, France, the Vessel suffered a breakdown of the reduction gear, more specifically, the gearbox ("Gearbox"), which forms part of the reduction gear. The reduction gear is a central part of the Vessel's propulsion system. As a result of the Gearbox

2

breakdown, the Vessel's main engine shut down so that the Vessel was without propulsion and adrift at sea. Accordingly, the Finisterre, Spain traffic control was contacted at 09:30 hours concerning the Vessel's breakdown and its location, at position 42° 19' N and 10° 52' W, which is 34 nautical miles south of the Finisterre traffic separation zone. As a result of the Gearbox breakdown, the Vessel was towed by the tug "Sting Ray" to the repair pier of the E.N.V.C. Ship Yard in Viana do Castelo, Portugal, which is the closest shipyard in the area with an available pier.

8.     Notification of the Vessel being adrift at sea, close to the Finisterre traffic separation zone, was vital because an adrift vessel can cause serious disruption and hazard to maritime commerce by interfering with vessels traversing the separation zone.

9.     The breakdown of the Gearbox properly falls within the thirty-six month guarantee provided by Yardimci pursuant to Article IX.1 of the Contract.

10.     Pursuant to Article IX.2 and Appendix 2 of the Contract, on May 29, 2008 Fouquet provided prompt notice of the Gearbox defect by way of e-mail, which included Article IX of the Contract for reference. A true and correct copy of the defect notice and attached Article IX is attached hereto as Exhibit 2.

11.     As a result of the breakdown, Fouquet undertook to have three independent surveys of the Gearbox and the Vessel conducted. All three surveys determined that the cause of the gearbox failure was either a result of the original design of the Gearbox or the materials used in the construction of the Gearbox fitted on board the Vessel by Yardimci (both of which were the responsibility of Yardimci under the terms of the Contract) and that Fouquet's actions as owner did not contribute to the failure of the Gearbox. By way of example, a copy of the SCUA survey dated July 10, 2008 is annexed as Exhibit 3.

12.     On or about July 10, 2008 Fouquet submitted to Yardimci the claim form regarding the Gearbox breakdown, demanding reimbursement "for the cost of the repairs." A true and correct copy of which is attached hereto as Exhibit 4.

13.     In order to prevent the Vessel from being placed off-hire for a lengthy period under the Vessel's charterparty and thus losing the revenue of the Vessel in maritime commerce, Fouquet undertook to make temporary repairs to the Gearbox at its own expense in accordance with Article IX.3, while awaiting new materials from the manufacturer to allow permanent repairs to be undertaken.  As a result, pursuant to the Contract, Yardimci was required to immediately pay to Fouquet the costs of the repair.

14.     In breach of the Contract, Yardimci has failed to reimburse Fouquet for expenses incurred to make the temporary repairs.  Because of Yardimci's breach of the Contract, Fouquet has suffered damages in the amount of **US$304,502.70** expended to make temporary repairs to the Gearbox.

15.     After the temporary repairs were effected, Fouquet, again at its own expense and in accordance with Article IX.3, obtained new housing and new rotating gear wheels from the Gearbox manufacturer and made permanent repairs.  As a result, again pursuant to the Contract, Yardimci was required to immediately pay to Fouquet the costs of the permanent repair.  In breach of the Contract, Yardimci has failed to reimburse Fouquet for expenses incurred to make the permanent repairs. Because of Yardimci's breach of the Contract, Fouquet suffered damages in the amount of **US$2,649,344.71** expended to make the permanent repairs to the Gearbox.

16.     A spread sheet providing a breakdown of the permanent repairs and the temporary repairs to the Gearbox, respectively, is attached hereto as Exhibit 5.[1]

---

[1] The actual invoices for the numerous warranty repair items are voluminous, but are available and will be provided should the Court wish to review them.

4

## Fouquet's Second Cause of Action for
## Breach of Warranty of Parts and Equipment

17.     Pursuant to Article IX.1 of the Contract, entitled "Warranty of Quality", Yardimci guaranteed the Vessel for a period of twelve months following delivery to Fouquet for "hull and machinery and all parts, spare parts and equipment thereof that are manufactured or furnished or supplied by [Yardimci] and/or its subcontractors under this Contract including material, equipment ... against all defects which are due to defective materials, or equipment, errors, miscalculation, faulty construction, faulty design and/or poor workmanship."

18.     Following delivery of the Vessel, numerous items on board the Vessel have required replacement and/or repair by reason of their being defective, faulty, of faulty design and/or poor workmanship.

19.     Pursuant to Article IX.2 and Appendix 2, between June and November 2006, Fouquet provided prompt notices of defects for which claims are being submitted.  True and correct copies of the notice letters are annexed as Exhibit 6.

20.     Fouquet undertook to repair the warranty items at its own expense in accordance with Article IX.3.  As a result, pursuant to the Contract, Yardimci was required to immediately pay to Fouquet the costs of the repair.  In breach of the Contract, Yardimci has failed to reimburse Fouquet for expenses incurred to repair the warranty items. Because of Yardimci's breach of the Contract, Fouquet has suffered damages in the amount of **US$2,098,681.20** (that being the U.S. Dollar equivalent of Euro 1,499,058.00 with an exchange rate of Euro 1 - US$1.40)  expended to make repairs to the warranty items.  A spreadsheet setting forth a breakdown of the warranty claims is attached hereto as Exhibit 7.[2]

---

[2] The actual invoices for the numerous warranty repair items are voluminous, but are available and will be provided should the Court wish to review them.

21.  By failing to remedy the defects alleged in paragraphs 6 to 20, Yardimci has breached the Contract.  More specifically, Article XI.6 provides that " [Yardimci] shall be deemed to be in default under this Contract:....[if Yardimci] is in material breach relating to this Contract and fails to remedy same within ten (10) business days after [Fouquet's] notice....".  As a result of Yardimci's breach, Fouquet has suffered damages in principal amount as follows:

| | |
|---|---|
| Initial Repair to Gearbox | US$   304,520.70 |
| Subsequent Surveys and Repairs to Gearbox | US$2,649,344.71 |
| Additional Warranty Items | US$2,098,681.20 |
| Total Principal Claim | US$5,052,546.61 |

22.  On or about February 5, 2009, Fouquet sent a letter to Yardimci requesting settlement of the outstanding claims related to the breach of the warranty by Yardimci.  A true and correct copy of the letter dated February 5, 2009 (without exhibits, many of which are already provided as exhibits herein), is annexed as Exhibit 8.

23.  On or about February 27, 2009, London Solicitors Norton Rose LLP, acting on behalf of Fouquet, sent a letter to Yardimci requesting settlement of the outstanding warranty claims.  A true and correct copy of the letter dated February 27, 2009 is annexed as Exhibit 9.

24.  Under Article XIII.1 of the Contract, any and all disputes arising under the Contract are subject to arbitration in London under English Law.

25.  Under English law, a valid maritime claim arises out of "construction, repair or equipment of any ship."  Int'l Convention Relating to the Arrest of Sea-Going Ships art. 1(1)(l), May 10, 1952, 439 U.N.T.S. 193 (ratified by the United Kingdom on Mar. 18, 1959).  Fouquet's breach of warranty claims under the Contract are valid maritime claims under English law and thus supports its Rule B application. *See Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007) ("[t]he existence *vel non* of a valid maritime claim for

purposes of a Rule B writ of attachment turns upon the applicable substantive law, in this case the law of contract."); *see also Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd.*, 2008 U.S. Dist. LEXIS 2438, at *10 (S.D.N.Y. Jan. 9, 2008) (holding that English law controlled whether plaintiff met its burden of showing that it has a maritime claim in support of a Rule B application by stating "the parties agreed that English law would govern under the charter party, thus, the Court considers whether Naias has asserted a maritime claim under English law."); *Carpentine Limited v. Stocznia Szezecinska Nowa Sp. z.o.o.*, No. 09 Civ. 358 (GEL) (granting Order of Maritime Attachment and Garnishment for the breach of a vessel shipbuilding and sale contract subject to English law); *but see Harley Mullion & Co. Limited v. Calverton Marine Limited*, 2008 WL 4905460 (S.D.N.Y. Aug. 7, 2008) (failing to apply the substantive law of the contract to the maritime claim consideration for Rule B purposes.).[3]

26.     Under English law and in London arbitration, arbitration awards regularly include costs, including a reasonable allowance for attorneys' fees. Attorneys' fees and arbitration costs are estimated to be US$400,000.00.

27.     It is estimated that it will take approximately two (2) years to resolve this matter. Under relevant English law and arbitration procedure, a reasonable interest rate is 3.25%, resulting in the following estimated interest and attorneys' fees in addition to Fouquet's principal claim:

---

[3] In the alternative, pursuant to Fed. R. Civ. P. 8(d)(2) and (3), the Court has admiralty jurisdiction under the general maritime law of the United States over the repair aspects of the Contract. *See Kalafrana Shipping Ltd. v. Sea Gull Shipping Co. Ltd.*, 2008 WL 4489790, at *4 and n. 53, 54 (S.D.N.Y. Oct. 4, 2008) (holding admiralty jurisdiction exists with respect to the repair aspects of a ship sales contract, analogous to the Contract herein). Article IX, Warranty of Quality, provides Yardimci "further guarantees any repair or replacement effected pursuant to this Article." Exhibit 1; see also IX.3, addressing equipment repairs. Certainly Fouquet is mindful of the general U.S. rule that shipbuilding contracts are not maritime (*see, e.g., People's Ferry Co. v. Beers*, 61 U.S. (20 How.) 393 (1857)), which would preclude the Rule B action here. However, the Vessel failure and claims did not occur during the Vessel construction period; the Vessel failures occurred after delivery while the Vessel was in navigable waters and performing maritime commerce activities. Stated differently, this is a claim based on failure to repair an identifiable vessel belonging to Fouquet, not a construction claim. As such, Fouquet's allegations must be construed "so as to do justice" and under whichever law applies to this Supplemental Rule B action, Plaintiff should be entitled to security in support of the underlying arbitration proceeding. Fed. R. Civ. P. 8(e).

Interest (3.25% on US$5,052,546.61 for two years)  $  328,415.53

Attorneys' fees and costs                            $  400,000.00

Principal Claim:                                        $5,052,546.61
**Total Sought:**                                      **US$5,780,962.14**

28.     Article II.1 of the Contract provides for the contract price to be in U.S. Dollars, subject to an adjustment for the exchange rate of Euros.  Article II.2 requires that all payments by Fouquet to Yardimci be made in U.S. Dollars.  Article II.4 provides that payment should be remitted by "telegraphic transfer" to an account number nominated by Yardimci. It is common practice in the international shipbuilding industry for contracts to require that payments be made in U.S. Dollars and payments are made in U.S. Dollars in conformance with such requirements. "Telegraphic transfers" may be made by electronic fund transfers.  International electronic fund transfers in U.S. Dollars between two non-U.S. entities pass through intermediary banks in New York.

29.     Yardimci is not found within the Southern District of New York but—as evidenced by the U.S. Dollar amounts included in the Contract—does have goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the jurisdiction at the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York Mellon; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan

Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; or other financial institutions within the Southern District of New York.

30.   While all disputes arising out of the Contract are to be arbitrated in London, this action is submitted in accordance with Rule B of the Supplemental Rules of Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8 and should not be considered a waiver of the Contract's arbitration clauses.

**WHEREFORE**, Fouquet Sacop S.A. demands judgment as follows:

1.   That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against the Defendant Yarmimci Gemi Insa A.S. in the amount of US$5,780,962.14 (including estimated interest, attorneys' fees and arbitration costs), and if Defendant Yardimci Gemi Insa A.S. cannot be found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the district may be attached in an amount sufficient to answer Plaintiff's claim;

2.   That Yardimci Gemi Insa A.S. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.   That this court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court, along with awarding Plaintiff's attorney's fees and costs in connecting with these actions;

4.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

5.    That this Court grant Plaintiff such other and further relief which it may deem just and proper.

Dated: New York, New York
        August 27, 2009

                                            HOLLAND & KNIGHT LLP

                            By:    _____
                                            James H. Hohenstein
                                            Christopher R. Nolan
                                            Lissa D. Schaupp
                                            HOLLAND & KNIGHT LLP
                                            195 Broadway
                                            New York, NY  10007-3189
                                            (212) 513-3200
                                            Telefax:  (212) 385-9010
                                            E-mail:  jim.hohenstein@hklaw.com
                                                        chris.nolan@hklaw.com
                                                        lissa.schaupp@hklaw.com

                                            Attorneys for Plaintiff,
                                            *Fouquet Sacop S.A.*

## VERIFICATION

STATE OF NEW YORK              )
                                                 :ss.:
COUNTY OF NEW YORK        )

CHRISTOPHER R. NOLAN, being duly sworn, deposes and says:

I am associated with the firm of Holland & Knight LLP, counsel for Plaintiff Fouquet Sacop S.A. ("Plaintiff") in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff's representatives regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
Christopher R. Nolan

Sworn to before me this
27th day of August, 2009

_____
Notary Public

Anthony C. Keeney
Notary Public, State of New York
NO. 01KE6181777
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires February 11, 20 12

# 8784184_v1

11

# EXHIBIT 1

ACQUISITION CONTRACT

FOR

ONE 11,000 DWT MOLTEN SULPHUR AND ASPHALT TANKER

(HULL NO. 040)

BETWEEN

FOUQUET SACOP SA OR NOMINEE

AS BUYER

AND

YARDIMCI GEMI INSA A.S.

AS BUILDER

## ARTICLE II

### CONTRACT PRICE & TERMS OF PAYMENT

**1    CONTRACT PRICE**

The Contract Price of the VESSEL is United States Dollars Twenty Six Million Five Hundred Thousand (USD26,500,000), receivable by the BUILDER (hereinafter called the "Contract Price"), which is exclusive of the cost for the BUYER's supplies as provided in Article V hereof, and shall be subject to upward or downward adjustment, if any, as hereinafter set forth in this Contract.

The Contract Price of the Vessel is to be partly adjusted for an amount of United States Dollars Eight Million Five Hundred Thousand (USD8,500,000) which will remain the same up to a rate of exchange of US$1.19/€1. Above this rate of exchange (however capped at US$1.30/€1) the Buyer will compensate the Builder, at the time of delivery of the VESSEL upon the exchange rate US$/€ then prevailing at such delivery date.

**2    CURRENCY**

Any and all payments by the BUYER to the BUILDER under this Contract shall be made in United States Dollars.

**3    TERMS OF PAYMENT**

The Contract Price shall be paid by the BUYER to the BUILDER in instalments as follows:

(a) 1st Instalment:

The sum of United States Dollars Two Million Six Hundred and Fifty Thousand (USD2,650,000), representing ten percent (10%) of the Contract Price shall become due and payable and be paid by the BUYER on steel cutting scheduled to take place on 18 June 2004 provided that the BUILDER has provided the BUYER with the following documents:

- Certificate issued by the Classification Society confirming the milestone is achieved;
- Refund guarantee and counter guarantee issued in compliance with Article II – 5 hereunder.

(b) 2nd Instalment:

The sum of United States Dollars Three Million Nine Hundred and Seventy Five Thousand (USD3,975,000), representing fifteen percent (15%) of the Contract Price shall become due and payable and be paid by the BUYER on keel laying scheduled to take place on 30 August 2004 provided that the BUILDER has provided the BUYER with the following documents:

- Certificate issued by the Classification Society confirming the milestone is achieved;
- Refund guarantee and counter guarantee issued in compliance with Article II – 5 hereunder.

(c) 3rd Instalment:

The sum of United States Dollars Two Million Six Hundred and Fifty Thousand (USD2,650,000), representing ten percent (10%) of the Contract Price shall become due and payable and be paid by the BUYER on delivery of the main engine scheduled to take place on 15 November 2004 provided that the BUILDER has provided the BUYER with the following documents:

- Certificate issued by the Classification Society confirming the milestone is achieved;
- Refund guarantee and counter guarantee issued in compliance with Article II – 5 hereunder.

(d) 4th Instalment:

The sum of United States Dollars Three Million Nine Hundred and Seventy Five Thousand (USD3,975,000), representing fifteen percent (15%) of the Contract Price shall become due and payable and be paid by the BUYER on launching of the Vessel scheduled to take place on 1st February 2005 provided that the BUILDER has provided the BUYER with the following documents:

- Certificate issued by the Classification Society confirming the milestone is achieved;
- Refund guarantee and counter guarantee issued in compliance with Article II – 5 hereunder.

(e) 5th Instalment

The sum of United States Dollars Thirteen Million Two Hundred and Fifty Thousand (USD13,250,000), representing fifty percent (50%) of the Contract Price, plus any increase or minus any decrease due to modification and/or adjustment of the Contract Price, if any, in accordance with the provisions of this Contract, shall become due and payable on delivery of the VESSEL as evidenced by the execution by the BUILDER and the BUYER of the Protocol of Delivery and Acceptance mentioned in Article VII Delivery of this Contract.

### 4    METHOD OF PAYMENT

The BUYER shall remit the amount of the first and/or second and/or third and/or fourth instalments in accordance with Article II, Paragraph 3(a), 3(b), 3(c) or 3(d) by telegraphic transfer to the account number and bank to be nominated by BUILDER with instructions as follows: Payment for hull No 040 for Yardimci Gemi Insa A.S. or through other receiving bank to be nominated by the BUILDER from time to time and such nomination shall be notified to the BUYER at least ten (10) days prior to the due date for the payment.

### 5    REFUND GUARANTEE AND COUNTER GUARANTEE

As security for the BUILDER's obligations to refund to the BUYER each of the instalments received in accordance with sub-article 3(a) to 3(d) hereinabove, the BUILDER shall furnish to the BUYER a refund security by way of a refund guarantee substantially in the form attached in Appendix 3 hereto to be issued in favour of the BUYER by a bank satisfactory to the BUYER, such bank being Finansbank or such other Turkish bank, securing the due and punctual fulfilment of the said obligations. Such refund guarantee to be in an amount corresponding to the instalment to be paid and to be provided not later than three (3) banking days prior payment of the said instalment by the BUILDER's bank to the BUYER's bank by tested telex.

Such refund guarantee to be counter-guaranteed by a first class European bank to be acceptable to the BUYER and such counter guarantee to be in an amount corresponding to the amount guaranteed by the refund guarantee and to be provided not later than three (3) banking days prior payment of the said instalment by the BUILDER's bank to the BUYER's bank by tested telex.

ARTICLE IX

WARRANTY OF QUALITY

1 . - .GUARANTEE OF MATERIAL AND WORKMANSHIP

The BUILDER, for a period of twelve (12) months following delivery to the BUYER of the VESSEL (the "Guarantee Period"), guarantees the VESSEL, her hull and machinery and all parts, spare parts and equipment thereof that are manufactured or furnished or supplied by the BUILDER and/or its subcontractors under this Contract including material, equipment (however excluding any parts for the VESSEL which have been supplied by or on behalf of the BUYER) against all defects which are due to defective materials, or equipment, errors, miscalculation, faulty construction, faulty design and/or poor workmanship.

As above mentioned, the BUILDER's guarantee shall not apply to the equipment supplied by the BUYER according to the Specifications, except to the extent of the installation which has been performed by the BUILDER.

The BUILDER shall assign to the BUYER to the extent assignable, concurrently with delivery and acceptance of the VESSEL all of its rights against any subcontractors and suppliers under any guarantee or warranty as security for its fulfilment of its obligations under this Article and notify the relevant supplier thereof. For so long as the BUILDER shall perform its obligations under this Article, the BUYER shall not exercise any of its rights under this assignment or under the assigned guarantees or warranties. Any assignment shall not limit the obligations of the BUILDER under this Contract. The BUILDER shall use its reasonable endeavours to negotiate rights of assignment in favour of the BUYER in respect of contracts entered into with suppliers or subcontractors.

All claims under guarantees or warranties assigned, wholly or partly according to this paragraph shall, if the BUYER so requests, and subject to the preceding paragraph, be made by the BUILDER on behalf of the BUYER.

To the extent that any guarantee or warranty of any subcontractor or supplier is broader or has a longer duration than the obligations of the BUILDER under this article, the BUILDER shall assign the benefit of such guarantee or warranty to the BUYER.

The BUILDER further guarantees any repair or replacement effected pursuant to this Article of such repair or replacement to the extent same is obtainable from the suppliers or manufacturers of the said equipment.

Pending agreement with the suppliers and/or manufacturers, the BUILDER's guarantee shall include:

- all the propulsion equipments (main engine, reduction gear, shaft line and CPP) for a period of thirty (36) months as from the Actual Delivery Date. Any wear and tear within the design criteria will be for the BUYER's account after the first one year guarantee.

- The main diesel generators (auxiliary diesels generators, alternators and attached equipments. Any wear and tear within the design criteria will be for the BUYER's account after the first one year guarantee

Pending agreement with the suppliers and/or manufacturers, the BUILDER's guarantee shall include the paint coating of seawater ballast tanks and void spaces of the SHIP for a period of thirty six (36) months after the Actual Delivery Date under following terms and conditions:

| | | | | |
|---|---|---|---|---|
| (i) | Photo | 1st year | RE 2 | |
| | (European scale | 2nd year | RE 2 | |
| | degree of corrosion) | 3rd year | RE 2 | |
| (ii) | Cover (costs) | 1st year | 100 % | |
| | | 2nd year | 90 % | |
| | | 3rd year | 80 % | |
| (iii) | Exclusion (areas) | 1st year | | 1 % |
| | | 2nd year | | 1,5 % |
| | | 3rd year | | 2 % |

The BUYER shall not be obliged to carry out paint touch-ups or repairs during the Guarantee Period of thirty six (36) months if the condition of the paint remains within the above mentioned criteria.

All travelling, accommodation and incidental costs of the BUILDER and/or his Sub-Contractors and/or attending engineers shall be for the account of the BUILDER and his sub-contractors.

## 2    NOTICE OF DEFECTS

(a) The BUYER shall notify the BUILDER by telefax or email, as promptly as possible, after discovery of any defect or deviations for which a claim is made under this guarantee.   The BUYER's written notice (as per proforma attached hereto in Appendix 2) shall describe the nature of the defect and the extent of the damage caused thereby.

(b) The BUILDER shall have no obligation under this guarantee for any defects discovered prior to the expiry date of the guarantee, unless notice of such defects, is given by the BUYER not later than fifteen (15) business days after such expiry date. Telefaxed or email advice with brief details explaining the nature of such defect and extent of damage is to be provided within fifteen (15) business days after such expiry date and a statement that a claim is forthcoming will be sufficient compliance with the requirements as to time.

(c) The BUILDER is to acknowledge receipt of the claim by email or telefax within five three (3) days after notification sent by the BUYER by fax or email (such period will not apply when the defect or deficiency imperilled the VESSEL or her operations safety). The BUILDER within ten days of BUYER's request is to inform the BUYER as to whether the BUILDER accepts the claim to be covered by the Guarantee.  If the BUILDER fails to respond within the ten day period, the BUILDER's acceptance shall be deemed granted.

(d) If the BUILDER becomes aware of defective materials or design or construction within the nature of serial defect in respect of the VESSEL or any other vessel built by the BUILDER the BUILDER shall immediately notify the BUYER in writing and by telefax.

(e) Any claim by the BUYER under this guarantee which is not accepted by the BUILDER shall, if possible as to content, be referred to the Classification Society for final decision and otherwise be referred to arbitration as provided for in Article XIII.

3    **REMEDY OF DEFECTS**

The BUILDER shall remedy at its expense any defects, against which the VESSEL or any part of the equipment thereof is guaranteed under this Article by making all necessary repairs and/or replacement. Such repairs and/or replacement will be made by the BUILDER.

Drydocking if necessary including dry docking charges shall be for the account of the BUILDER to the extent that such dry-docking is proved to have been necessary in order to remedy any such defect; the burden of proof shall be borne by the BUYER in conjunction with the Classification Society.

Any freight or forwarding costs incurred by the BUILDER in respect of sending any spare parts or replacement parts to the VESSEL shall be for the account of the BUILDER.

However, if it is impractical to make the repair by the BUILDER, and if forwarding by the BUILDER of replacement parts, and materials can not be accomplished without impairing or delaying the operation or working of the VESSEL, then, in any such event, the BUYER shall cause the necessary repairs or replacements to be made elsewhere at the discretion of the BUYER provided that the BUYER shall first and in all events, as soon as possible, give the BUILDER notice by email confirmed by telefax of the time and place such repairs will be made, and the BUILDER shall have the right at its own cost to make attendance and verification without unreasonably impairing vessel's operational commitments by its own representative(s) or that of Classification Society the nature and extent of the defects complained of. In all minor cases, the Guarantee Engineer, as hereinafter provided for, will act for and on behalf of the BUILDER.

In any circumstances, the BUILDER shall immediately pay to the BUYER by telegraphic transfer the actual cost for such repair or replacements including forwarding charges, or at the average costs of making similar repairs as quoted by three reputable shipyards or repair yards in Turkey, Spain, and Portugal.

4    **EXTENT OF THE BUILDER'S LIABILITY**

The BUILDER shall have no obligation and/or liabilities with respect to defects discovered after the expiration of the period of guarantee specified above except for the propulsion system, main diesel generators, painting system as mentioned in Article IX -1 the guarantee of which shall be for 36 months as from the Actual Delivery Date of the VESSEL.

The BUILDER shall be liable to the BUYER for defects and damages caused by any of the defects specified in Paragraph 1 of this Article provided that such liability of the BUILDER shall be limited to damage occasioned within the guarantee period specified in Paragraph 1 above. The BUILDER shall not be obligated to repair, or to be liable for, damages to the VESSEL, or to any part of the equipment thereof, due to ordinary wear and tear or caused by the defects other than those specified in Paragraph 1 above, nor shall there be any BUILDER's liability hereunder for defects in the VESSEL, or any part of the equipment thereof, caused by fire or accidents at sea or elsewhere, or mismanagement, misoperation, negligence, or wilful neglect, on the part of the BUYER, its employees or agents including the VESSEL's officers, crew and passengers, or any persons on or doing work on the VESSEL other than the BUILDER, its employees, agents or sub contractors.

*JK*

Likewise, the BUILDER shall not be liable for defects in the VESSEL, or the equipment or any part thereof, due to repairs or replacement which were made by those other than the BUILDER and/or their subcontractors without prior consent of the BUILDER, such consent to be deemed granted if the BUILDER fails to respond within the period mentioned in paragraph 2(c) of this Article.

Upon delivery and acceptance of the VESSEL in accordance with the terms of this Contract, the BUILDER shall thereby and thereupon be released of all responsibility and liability whatsoever and howsoever arising under or by virtue of this Contract (save in respect of those obligations to the BUYER expressly provided for in this Article IX). The BUILDER shall not, in any circumstances, be liable for any consequential loss or special loss, or expenses arising from any cause whatsoever including, without limitation, loss of time, loss of profit or earnings or demurrage directly from any commitments of the BUYER in connection with the VESSEL.

The Guarantee provided in this Article and the obligations and the liabilities of the BUILDER hereunder are exclusive and in lieu of law and the BUYER hereby waives all other remedies, warranties, guarantees or liabilities, express or implied, arising by Law or otherwise on the part of the BUILDER. This Guarantee shall not be extended, altered or varied except by a written instrument signed by the duly authorized representatives of the BUILDER, and the BUYER.

## 5    GUARANTEE ENGINEER

There will be a guarantee engineer (treated as a chief engineer) on a permanent basis for the first 3 months of the Guarantee Period.

The guarantee engineer will come back on board when deemed necessary upon request by the BUYER and at least the last month of the Guarantee Period.

Review of all guarantee claims will be done by meeting at Buyers office at the end of the Guarantee Period.

The costs of the guarantee engineer shall be borne by the BUIDER including repatriation costs; the BUYER shall provide the Guarantee Engineer with officer's class accommodations and facilities on board the VESSEL.

The BUILDER shall be responsible, at its costs and expenses for the PANDI liability of the guarantee engineer.



SK

ARTICLE XIII

DISPUTES AND ARBITRATION

1    PROCEEDINGS

In the event of any dispute between the parties hereto as to any matter arising out of or relating to this Contract or any stipulation herein or with respect thereto which cannot be settled by the parties themselves, such dispute shall be resolved by arbitration in London, England in accordance with the Laws of England as per rules of London Arbitration Act 1950 and 1979 or any statutory modifications or re-enactments for time being in force. The arbitration shall be arbitration with reasoned awards. Either party may demand arbitration of any such disputes by giving written notice to the other party. Any demand for arbitration by either party hereto shall state the name of the arbitrator appointed by such party and shall also state specifically the question or questions as to which such party is demanding arbitration. Within ten (10) business days after receipt of notice of such demand for arbitration, the other party shall in turn appoint a second arbitrator. The two arbitrators thus appointed shall thereupon select a third arbitrator, and the three arbitrators so named shall constitute the board of arbitration (hereinafter called the "Arbitration Board") for the settlement of such dispute.

In the event however, that said other party should fail to appoint a second arbitrator as aforesaid within ten (10) business days following receipt of notice of demand of arbitration, it is agreed that such party shall thereby be deemed to have accepted and appointed as its own arbitrator the one already appointed by the party demanding arbitration, and the arbitration shall proceed forthwith before this sole arbitrator, who alone, in such event, shall constitute the Arbitration Board. And in the further event that the two arbitrators appointed respectively by the parties hereto as aforesaid should be unable to reach agreement on the appointment of the third arbitrator within ten (10) business days from the date on which the second arbitrator is appointed, either party of the said two arbitrators may apply the President of the London Maritime Arbitrators' Association in London to appoint the third arbitrator. The award of the arbitration, made by the sole arbitrator or by the majority of the three arbitrators as the case may be, unless appealed by either party, shall be final, conclusive and binding upon the parties hereto.

2    ALTERNATIVE ARBITRATION BY AGREEMENT

Notwithstanding the preceding provisions of this Article, it is recognized that in the event of any dispute or difference of opinion arising in regard to technical matters on the construction of the VESSEL, her machinery and equipment, or concerning the quality of materials or workmanship in relation to class matters thereof or thereon, such dispute shall be referred to the Classification Society. In such case, the opinion of the Classification Society shall be final and binding on the parties hereto.

3    NOTICE OF AWARD

Notice of any award shall immediately be given in writing or by telefax confirmed in writing to the BUILDER and the BUYER.

**4    EXPENSES**

The arbitrator(s) shall determine which party shall bear the expenses of the arbitration or the proportion of such expenses which each party shall bear.

**5    AWARD OF ARBITRATION**

Award of arbitration, unless appealed by either parties, shall be final and binding upon the parties concerned.

**6    ENTRY IN COURT**

Judgement on any award may be entered in any court of competent jurisdiction.

**7    ALTERATION OF DELIVERY TIME**

In the event of reference to arbitration of any dispute arising out of matters occurring prior to delivery of the VESSEL, the BUILDER shall not be entitled to extend the Delivery Date as defined in Article VII hereof and the BUYER shall not be entitled to postpone its acceptance of the VESSEL on the Delivery Date or on such newly planned time of delivery of the VESSEL as declared by the BUILDER. However, if the construction of the VESSEL is affected by any arbitration or court proceeding, the BUILDER shall then be permitted to extend the Delivery Date as defined in Article VII and the decision or the award shall include a finding as to what extent the BUILDER shall be permitted to extend the Delivery Date.

## APPENDIX 2

### DEFECTS PICKUP LIST N°

DATE ISSUED :                                    LEVEL : NORMAL  HIGH  URGENT
                                                 GUARANTEE : YES

DEPARTMENT :                         OWNER CODE :
EQUIPMENT :
TYPE :
MAKER :
DRAWING N° :

Article I.        DEFECT  DESCRIPTION

Article II.       REPAIR WORKS OR INVESTIGATION CARRIED OUT

Article III.      SPARE PARTS OR MATERIALS USED

Article IV.       REQUIRED ACTION

REQUIRED SPARE PARTS

Article V.        COMMENTS

Article VI.       VESSEL ' S SERVICES
                        Normal hour              overtime
Officers
Rating

CONTRACTORS USED by managers due to emergency situation

EMERGENCY SITUATION DUE TO :

Contractors:                         cost estimates:

# EXHIBIT 2

| | |
|---|---|
| **From:** | FIEVET Frédéric [IMCEAEX-_O=FSM_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=FFIEVET@sea-tankers.fr] |
| **Sent:** | Thursday, May 29, 2008 11:58 AM |
| **To:** | Hasan Koray Coskun |
| **Cc:** | Huseyin YARDIMCI; Guarantee DEPARTMENT; Ugur SOKU; GARIN Christian; CUZZI Florence; MASSOT Alain |
| **Subject:** | RE: 'Contracts' for MAK 6M43 Marine Diesel Engine Including Propulsion Packace |
| **Attachments:** | _0529174328_001.tif |

Good evening

Thank you for your mail.
It confirms initial terms between FS & Yardimci (cf attached pages)

As mentioned by phone to Huseyin, FS CHARLOTTE suffered gear box defect on 23/05, 50 Miles off Vigo.
Decision was made to tow the vessel to Viana do Castelo, ENVC ship Yard, Portugal
FS CHARLOTTE berthed at ship yard on 26/05

Survey by SCANA VOLDA technician is in progress started 26/05:
> full dismantling
> full disembarking
> transportation tomorrow to Norway for full survey, expected to start 3/06/2008 in SCANA VOLDA factory

Kindly inform NIVEKO accordingly
> To liaise with SCANA VOLDA
> And confirm guarantee coverage of such failure

For any technical detail you may contact Alain MASSOT 33 6 20 51 25 22 / technical@fsm.fr

Waiting for hearing from you

Best regards



**Frédéric FIEVET**
Fleet Manager

Phone: 00 33 (0)4 95 09 31 43
Mobile: 00 33 (0)6 13 07 95 39
Fax: 00 33 (0)4 95 09 31 39
Mailto: ffievet@fsm.fr

*FOUQUET SACOP MARITIME*



marseille provence 2013
capitale européenne de la culture

---

**De :** Hasan Koray Coskun [mailto:koraycoskun@yardimci.gen.tr]
**Envoyé :** jeudi 29 mai 2008 16:15
**À :** FIEVET Frédéric
**Cc :** Guarantee DEPARTMENT; Ugur SOKU
**Objet :** 'Contracts' for MAK 6M43 Marine Diesel Engine Including Propulsion Packace

Good afternoon Mr. Fievet.

Please find attached 'Contract' for MAK 6M43 Marine Diesel Engine Including Propulsion Packace drafted on 17.04.2004 and Main Engine Warranty Extension Contract (addendum to 17.04.2004 contract) dated on August 2004 between Niveko (Mak) and Yardimci Shipyard.

I hope we can help.

*Best Regards,*
**H. Koray COSKUN** - Marine Chief Engineer

8/20/2009

Guarantee Department Manager
YARDIMCI SHIPYARD
Tersaneler Cad. 50. Sok. No:7
34947 Tuzla Istanbul TURKIYE

☎ [+90] (216) 493 80 00 - (250)
📠 [+90] (216) 493 02 26
Mobile: [+90] (533) 6596219
✉ koraycoskun@yardimci.gen.tr
✉ guaranteedepartment@yardimci.gen.tr

## ARTİCLE IX

## WARRANTY OF QUALITY

1    **GUARANTEE OF MATERIAL AND WORKMANSHIP**

The BUILDER, for a period of twelve (12) months following delivery to the BUYER of the VESSEL (the "Guarantee Period"), guarantees the VESSEL, her hull and machinery and all parts, spare parts and equipment thereof that are manufactured or furnished or supplied by the BUILDER and/or its subcontractors under this Contract including material, equipment (however excluding any parts for the VESSEL which have been supplied by or on behalf of the BUYER) against all defects which are due to defective materials, or equipment, errors, miscalculation, faulty construction, faulty design and/or poor workmanship.

As above mentioned, the BUILDER's guarantee shall not apply to the equipment supplied by the BUYER according to the Specifications, except to the extent of the installation which has been performed by the BUILDER.

The BUILDER shall assign to the BUYER to the extent assignable, concurrently with delivery and acceptance of the VESSEL all of its rights against any subcontractors and suppliers under any guarantee or warranty as security for its fulfilment of its obligations under this Article and notify the relevant supplier thereof. For so long as the BUILDER shall perform its obligations under this Article, the BUYER shall not exercise any of its rights under this assignment or under the assigned guarantees or warranties. Any assignment shall not limit the obligations of the BUILDER under this Contract. The BUILDER shall use its reasonable endeavours to negotiate rights of assignment in favour of the BUYER in respect of contracts entered into with suppliers or subcontractors.

All claims under guarantees or warranties assigned, wholly or partly according to this paragraph shall, if the BUYER so requests, and subject to the preceding paragraph, be made by the BUILDER on behalf of the BUYER.

To the extent that any guarantee or warranty of any subcontractor or supplier is broader or has a longer duration than the obligations of the BUILDER under this article, the BUILDER shall assign the benefit of such guarantee or warranty to the BUYER.

The BUILDER further guarantees any repair or replacement effected pursuant to this Article of such repair or replacement to the extent same is obtainable from the suppliers or manufacturers of the said equipment.

Pending agreement with the suppliers and/or manufacturers, the BUILDER's guarantee shall include:

- all the propulsion equipments (main engine, reduction gear, shaft line and CPP) for a period of thirty (36) months as from the Actual Delivery Date. Any wear and tear within the design criteria will be for the BUYER's account after the first one year guarantee.

- The main diesel generators (auxiliary diesels generators, alternators and attached equipments. Any wear and tear within the design criteria will be for the BUYER's account after the first one year guarantee

Pending agreement with the suppliers and/or manufacturers, the BUILDER's guarantee shall include the paint coating of seawater ballast tanks and void spaces of the SHIP for a period of thirty six (36) months after the Actual Delivery Date under following terms and conditions:

| | | | | |
|---|---|---|---|---|
| (i) | Photo | 1st year | RE 2 | |
| | (European scale | 2nd year | RE 2 | |
| | degree of corrosion) | 3rd year | RE 2 | |
| (ii) | Cover (costs) | 1st year | 100 % | |
| | | 2nd year | 90 % | |
| | | 3rd year | 80 % | |
| (iii) | Exclusion (areas) | 1st year | 1 % | |
| | | 2nd year | 1,5 % | |
| | | 3rd year | 2 % | |

The BUYER shall not be obliged to carry out paint touch-ups or repairs during the Guarantee Period of thirty six (36) months if the condition of the paint remains within the above mentioned criteria.

All travelling, accommodation and incidental costs of the BUILDER and/or his Sub-Contractors and/or attending engineers shall be for the account of the BUILDER and his sub-contractors.

## 2    NOTICE OF DEFECTS

(a) The BUYER shall notify the BUILDER by telefax or email, as promptly as possible, after discovery of any defect or deviations for which a claim is made under this guarantee. The BUYER's written notice (as per proforma attached hereto in Appendix 2) shall describe the nature of the defect and the extent of the damage caused thereby.

(b) The BUILDER shall have no obligation under this guarantee for any defects discovered prior to the expiry date of the guarantee, unless notice of such defects, is given by the BUYER not later than fifteen (15) business days after such expiry date. Telefaxed or email advice with brief details explaining the nature of such defect and extent of damage is to be provided within fifteen (15) business days after such expiry date and a statement that a claim is forthcoming will be sufficient compliance with the requirements as to time.

(c) The BUILDER is to acknowledge receipt of the claim by email or telefax within five three (3) days after notification sent by the BUYER by fax or email (such period will not apply when the defect or deficiency imperilled the VESSEL or her operations safety). The BUILDER within ten days of BUYER's request is to inform the BUYER as to whether the BUILDER accepts the claim to be covered by the Guarantee. If the BUILDER fails to respond within the ten day period, the BUILDER's acceptance shall be deemed granted.

(d) If the BUILDER becomes aware of defective materials or design or construction within the nature of serial defect in respect of the VESSEL or any other vessel built by the BUILDER the BUILDER shall immediately notify the BUYER in writing and by telefax.

# EXHIBIT 3

SCUA South Europe Lda.

Alcoitão

10th July 2008

Ref.No.:  **L  038/08**  JN/LIZ

# PRELIMINARY SURVEY REPORT

**M/V "FS CHARLOTTE"** of   Marseille
9.416 tons. gross.        Built year:    2006
Master: J.D. Le Merrer



At the request of SCUA Antwerp NV and on behalf of the Leading Hull Underwriters, the undersigned South Europe SCUA Office Lda. at Alcoitão has on the 26th May 2008 and subsequent days surveyed the above mentioned vessel, without prejudice to liability, whilst lying alongside the repair berth at E.N.V.C. Shipyard, Viana do Castelo, Portugal.

SCUA South Europe Lda.

-2-

Alcoitão

**"FS CHARLOTTE"**

**Present at the survey were also :**         **Representing:**
Mr. J.D. Le Merrer, Master                The Owners
Mr. A. Derrien, Chief Engineer            The Owners
Mr. A. Massot, Technical Manager          The Owners
Mr. B. Minguet,                           The Charterers, TOTAL
Mr. K.I. Øye, Service Engineer            Scana Volda
Mr. S. Aarflot, Service Engineer          Scana Volda
Mr. P. Neiva, Ship Manager                The E.N.V.C. Shipyard


The vessel departed from Jorf Lasfar, Morocco in ballast, bound for Bayonne, France ...................................................... 21st  May  2008

Main engine reduction gear box troubles first experienced under passage........................................................................ 23rd  May  2008

Damage sustained to the main engine reduction gear box ....... 23rd  May  2008

Tug **"STING RAY"** made fast and started towing towards Viana do Castelo .......................................................... 23rd  May  2008

Vessel arrived at Viana do Castelo  anchorage and tug **"STING RAY"** released.............................................................. 24th  May  2008

The vessel shifted alongside the E.N.V.C. repair berth............ 24th  May  2008

Repairs commenced................................................................ 26th  May  2008

Main reduction gear box dismantled ......................................... 29th  May  2008

Main reduction gear box arrived at Scana Volda in Norway ..................................................................................... 13th  June  2008


Survey was held in order to ascertain the nature and extent of damage sustained on the following occasion :

SCUA South Europe Lda.

-3-

Alcoitão

**"FS CHARLOTTE"**

**OCCURRENCE**

23rd May 2008 — On voyage from Jorf Lasfar, Morocco to Baionne, France in ballast.
**Main engine reduction gear box troubles**

Information available: — Statement of the Master, as per **enclosure no.1**.

— Chief Engineer's Damage Report, as per **enclosure no.2**

**GENERAL INFORMATION**

The **"FS CHARLOTTE"** is a molten sulphur/asphalt tanker with a Dead Weight of 12.496 tonnes, having been built at Yardmici Tersanesi A.S. in Tusla, Turkey in 2006, as yard no. 40.

The propulsion is provided by one 4-stroke MaK diesel engine, type 6M43, having 6 cylinders in line with 430 mm. bore and 610 mm. stroke, developing 5.400 kW. at 500 r.p.m., driving a 4 bladed controllable pitch propeller through a reduction gear box make: Scana Volda, type ACG105/850K/PF680-1 with the serial no. 1556.

This reduction gear box is provided with a power take off, driving an AVK DSU 86 shaft alternator, generating 1490 kW at 1800 r.p.m. that can also be used for propulsion in emergency situations (PTO/PTI).

The reduction gear box is a single-stage step up gear, with helical toothed, case hardened and flank ground gear wheels, built into a housing of cast iron.

The reduction gear ratio applied to the propulsion shaft is 3,58:1 and a hydraulic clutch make: Ortlinghaus type 85.000 is fitted on the forward end of the input shaft.

The PTO shaft is engaged through a hydraulic clutch make: Ortlinghaus type 69.001.

The input and propulsion shafts are bedded in pressure oil lubricated bearings lined with white metal, whereas the PTO shaft is supported by roller bearings make: NACHI, Japan.

SCUA South Europe Lda.                                    -4-

Alcoitão

**"FS CHARLOTTE"**

## OCCURRENCE   (cont.)

The gear box lubrication oil system is common with the controllable pitch propeller lubrication oil system.

The normal lubrication oil pressure of the reduction gear box according to the maker's instruction manual is 4 bar and the main lub oil pump with a capacity of 202 lts/min at 1800 rpm is driven by the PTO shaft while also an electrically driven stand-by lubrication oil pump is also provided.

The set point for the gear box low lubrication oil pressure alarm is 1.5 bar and for the main engine shutdown by gear box extra low lube oil pressure is 1.0 bar.

The Bureau Veritas inspection certificate of the reduction gear box was issued on 22.02.05 with the design review having been carried out on 21.09.04 and the gear box last inspected at the manufacturer premises on 20.10.04.

The data sheet for sea trials from Scana Volda found on board, though not signed nor stamped, indicates that first function test of the lubrication oil pump prior to sea trials was carried out on 29.01.06 and the sea trials having been commenced on 30.01.06 and completed on 02.02.2006. Also according with the same Scana Volda data sheet for sea trials, the gear contact patterns of both the propulsion and PTO gears were apparently not verified after sea trials.

The gear box had 14.800 running hours until the casualty date and the on board maintenance control is computer based, using the PMS Version 1.25 software.

The last routine maintenance tasks performed on the reduction gear box were reportedly the checking of the stop function control on 08.05.08 and the checking of the suction filter of the lubrication oil system carried out on 07.05.08 without any remarks.

It was also stated that no intervention besides normal maintenance routines had been carried out on the gear box.

The latest lubrication oil analysis report found onboard was dated 11.03.08, having been issued by TOTAL Lubmarine and confirming the oil in good condition.

It should however be noted that the Fe content had increased steadily from 15 mg/kg on February 2007 to 28 mg/kg on March 2008, indicating the occurrence and increase of wear in the gear box.

SCUA South Europe Lda.

Alcoitão

**"FS CHARLOTTE"**

-5-

## OCCURRENCE   (cont.)

### NARRATIVE

According to the information submitted by the Master and the Chief Engineer, as well as the one contained on the vessel's Deck and Engine Log Book copies and in the Chief Engineer's and Master's Damage reports, the vessel departed from Jorf Lasfar, Morocco on 21.05.08 in ballast, bound for Bayonne, France.

On 23.05.08 at 02:14 hrs, with the vessel under passage and the engine room unattended and the electrical power supplied by the shaft alternator, the C.P. propeller low lube oil pressure alarm went off with the pressure at 1.3 bar, followed by an automatic stop of the main engine, causing a black out.

At 02:15 hrs the electrical power was re established by the standby diesel generator.

After the installation had been checked by the crew, the main engine was restarted at 02:25 hrs with the C.P.P. lube oil pressure reportedly verified at 3.8 bar and the passage was resumed by 02:45 hrs with the shaft alternator disengaged, allegedly as precaution with and the electrical power supplied by the no.3 diesel engine driven generator.

Upon several hours with all reduction gear parameters reportedly verified to be normal by the engine crew, namely the lube oil pressure at 3.8 bar in the engine control console and at 4.4 bar locally, the shaft alternator was engaged again at 09:05 hrs in the morning.

At 09:23 hrs the C.P.P. low lube oil pressure alarm went off again reportedly with the oil pressure at 1 bar, whereupon the stand-by reduction gear lub. oil pump was manually started with the oil pressure reaching 4 bar.

Subsequently the no.3 diesel generator was re-connected to the main switchboard and the shaft alternator disengaged.

A few minutes later at 09:27 hrs the stand by lubrication oil pump was stopped and the lube oil pressure was immediately noticed reducing with the C.P.P. low lube oil pressure alarm coming off again and the main engine shutting down, although the stand by pump had been meanwhile re-started.

The Finisterre traffic control was contacted at 09:30 hrs with the vessel being declared not under command at position 42° 19' N and 10° 52' W, 34 NM south of the Finisterre traffic separation zone.

SCUA South Europe Lda.

Alcoitão

## OCCURRENCE   (cont.)

Further checking of the propulsion installation was carried out without finding any abnormality, whereupon the main engine was re-started again at 09:35 hrs, but was immediately manually stopped thereafter after a loud noise noticed coming from the reduction gear which housing was later found holed and cracked.

Upon opening the inspection door both forward roller bearings of the PTO shaft were observed to be severely damaged and with roller elements missing.

Whilst the vessel being adrift the management company was contacted to arrange a tugboat and at 14:20 hrs the first VHF contact was established with the tug "STING RAY" having arrived at the scene at 15:30 hrs and started towing the vessel towards Viana do Castelo at 16:33 hrs, where the tow arrived on 24.05.08 at 14:20 hrs.

The tug "STING RAY" was released at 18:36 hrs the same day, whereupon the vessel was shifted alongside the E.N.V.C. repair pier by 19:50 hrs.

## INSPECTION AT VIANA DO CASTELO

We firstly attended on board on 26.05.08 and noticed that two service engineers from Scana Volda had started dismantling the reduction gear box on the same day.



**Photo 1:** Reduction gear box with holed housing

The gear housing its upper casing was found holed and cracked in its lower casing in way of the PTO gear wheel.

SCUA South Europe Lda.

Alcoitão

-7-

**"FS CHARLOTTE"**

## OCCURRENCE   (cont.)

The attached lubrication oil pump was verified rotating freely and in apparent good condition with the shaft key in place, albeit with the synthetic coupling element found distorted.

Through the inspection doors in the gear box housing it was possible to observe the PTO wheel, which showed two teeth partly broken off and several other teeth battered.

The propulsion shaft was verified in place by the service engineers by using a dial gauge and its alignment was allegedly found in satisfactory condition.

An access opening had to be cut in the starboard side shell above the main deck in way of the engine room in order to land the dismantled gear box parts ashore.

On 29.05.08 the dismantling was completed when the PTO shaft assembly was inspected at the E.N.V.C. workshop, revealing that both forward roller bearings were significantly damaged with the retaining side rings and several roller elements missing and that the PTO shaft in between the forward roller bearing and the pinion was heavily grooved

The aft roller bearing on the PTO shaft was found with only the side retaining ring affected.

The following marking was found on the roller bearings: **NACHI 22232E W33C3 P1 JAPAN**



**Photo 2:** PTO pinion and roller bearings with loose roller elements

SCUA South Europe Lda.

Alcoitão

**"FS CHARLOTTE"**

-8-

## OCCURRENCE   (cont.)

Upon completion of the dismantling the damages observed in the pinion/wheel sets were as follows:

- Main propulsion pinion with 3 partly broken out teeth and several other battered;
- Main propulsion wheel with 2 teeth partly broken out and one heavily battered;
- PTO pinion with light scoring marks only;
- PTO wheel with several teeth partly broken out;

The PTO clutch was found with metallic particles inside.



**Photo 3:** Severe grooving and battering marks on the PTO shaft and loose roller element

The dismantled gear box was sent by truck to Scana Volda in Aalesund, Norway for a complete assessment of its condition, having arrived there on 13.06.08, whereupon it was concluded that a new housing and new rotating gears wheels would have to be provided and additionally all 4 white metal bearings and 3 roller bearings.

Given the 6 month delivery time foreseen by manufacturers, a temporary solution was proposed by the Owners and agreed upon with Scana Volda, comprising the repair of the affected propulsion pinion and wheel by cutting the affected teeth short in order to remove the affected areas.

SCUA South Europe Lda.

Alcoitão

**"FS CHARLOTTE"**

## OCCURRENCE   (cont.)

The repaired gear wheels would be fitted into a new gear housing available at Scana Volda and the maximum acceptable load on the gear box would have to be temporarily reduced to 3900 kW, while the PTO shaft would not be fitted.

An independently driven lubrication oil pump would have also to be fitted and fed from the main electrical switchboard to replace the main lube oil pump attached to the PTO shaft.



**Photo 4:** Main lube oil attached pump

Upon approval of the calculations submitted by Scana Volda to Class (BV), the temporary repairs would be accepted by Class, provided a load test at the manufacturers premises would be concluded satisfactorily and the repairs endorsed by Scana Volda.

The primary cause of the sustained gear box damage seems to be the failure of the PTO shaft forward roller bearings.

The damages sustained by the propulsion and PTO gear wheels and the gear housing are consequential and were caused by the disintegrated roller bearing elements that fell down from the failed forward roller bearings and passed through the gear wheels below, causing also the grooving marks on the PTO shaft.

The most likely reason for the failure of the PTO shaft roller bearings is still under investigation, however at this stage the following possible causes are suspected:

SCUA South Europe Lda.

Alcoitão

**"FS CHARLOTTE"**

## OCCURRENCE   (cont.)

- A design failure resulting in insufficient lubrication of the failed roller bearings;
- A material breakdown of the roller bearings;
- A vibration problem of the gear box assembly with the PTO engaged;
- An alignment problem of the gear box assembly;

The low lubrication oil pressure from the attached lube oil pump with the PTO engaged appears to be the first indication before the roller bearing elements had become loose and therefore a thorough assessment of the pump condition seems to be relevant in order to ascertain the root cause of the sustained damage.

It should also be noted that the standby lube oil pump is normally expected to start automatically, when the lubrication oil pressure drops, which apparently did not occur.

For easier understanding, excerpts of the gearbox drawings and some more photographs are attached as per **enclosures nos. 3** and **4** respectively.

Alcoitão, 10th July 2008

Drawn up without prejudice to liability
on behalf of the Leading Hull Underwriters
of  M/V **"FS CHARLOTTE"**

**for   SOUTH EUROPE SCUA OFFICE LDA.**

# EXHIBIT 4



*F O U Q U E T*
*S A C O P*
S.A.

YARDIMCI GEMI INSA A.S.
Aydintepe Mahallesi
Tersaneler Caddesi 50
Sokak No.7
81700 Tuzla
Istanbul
Republic of Turkey,

Attn: Husseyin Yardimci

Marseille, 10 July 2008

Dear Sir,

**REF. FS CHARLOTTE ExHULL N°040**
**GUARANTEE UNDER ARTICLE IX**

We are contacting you formally in our capacity of Buyers from you of the vessel FS CHARLOTTE pursuant to an Acquisition Contract between us dated 17 December 2003.

As you are aware, the vessel suffered a failure of the propulsion system on 23 May this year 40nm West of Vigo, Spain. The vessel was subsequently towed to the Portuguese yard at Viana Do Castelo, where repairs are being undertaken. It is not expected that first temporary repairs will be completed until 10 August 2008 and final repairs to be completed by January / February 2009.

Investigations have revealed that the cause of the breakdown was a failure of the reduction gear PTO/PTI shaft bearings.

Since the Builder pursuant to Article IX of the Acquisition Contract guaranteed the propulsion system for a period of 36 months from delivery to Buyers, we now call upon you to comply with your contractual obligations to reimburse us for the cost of the repairs. You are of course invited to investigate the vessel where she is situated at present and to verify the facts for yourselves. We confirm that it is and has been impractical to bring the vessel to your premises in Turkey given the length of tow required and the vessel's service commitments.

In addition, please be aware that this sudden failure of the vessel's propulsion system raises several issues with regard to the vessel's future performance. We understand that the repairs presently being carried out may only be sufficient for a temporary basis, and that further, permanent, repairs to the vessel are likely to be required in January 2009, the earliest point at which, we are informed by Scana Volda that the full repair will be available.

The vessel is currently chartered on a long term charterparty under which Buyers have guaranteed the vessel's speed at 14 knots. We are informed that, in the period between temporary repairs and final permanent repairs, the vessel may not be able to achieve the speed of 14 knots, and that a speed of 10 to 11 knots would be more realistic. There may also be an adverse impact on the vessel's consumption of MDO resulting from this breakdown.

As well as suffering lost hire, Buyers may now also face claims from their charterers in respect of vessel underperformance, until such time as permanent repairs may be undertaken.

10, place de la Joliette
Les Docks, Atrium 10.7
B.P. 24806
13567 Marseille Cedex 02

Tél. 33 (0) 4 95 09 31 40
Fax : 33 (0) 4 95 09 31 49

s.a. au capital de 5 000 000 € - siret 410 806 202 00025 - RCS Marseille B 410 806 202 - code NAF 671C

A Proforma estimated breakdown of the costs of repair is attached in Appendix 1 hereto.

A Proforma guarantee/claims form is also attached in Appendix 2 hereto. We now call upon you to confirm that you accept responsibility for the defects and for the costs of repair.

Investigations by Buyers are ongoing and all of Buyers' rights under the Acquisition Contracts are fully reserved

Yours faithfully

Christian Garin

APPENDIX 1

| FS CHARLOTTE : BREAKDOWN REDUCTION GEAR 23/05/2008 | | |
| --- | --- | --- |
| | ESTIMATED PROVISIONAL REPAIRS | ESTIMATED FINAL REPAIRS |
| AGENCY & PORT | | 60 000 € |
| TUG CONTRACT | | 50 000 € |
| SOB SCANA | | 25 000 € |
| ENVC | | 40 000 € |
| PEAR | | 60 000 € |
| MACHINING | 75 000 € | |
| TEST AND LOAD | 30 000 € | |
| TRANSPORT | 9 000 € | |
| ENVC | 30 000 € | |
| SOB SCANA | 25 000 € | |
| NEW HOUSING | | 240 000 € |
| SPARE PARTS | | 163 000 € |
| NEW WHELLS | | 165 000 € |
| ENVC | | 30 000 € |
| TRANSPORT | | 5 000 € |
| SOB SCANA | | 40 000 € |
| PEAR | | 20 000 € |
| AGENCY & PORT | | 5 000 € |
| CLASS FEES | 15 000 € | 36 000 € |
| TOTAL COSTS | 164 000 € | 939 000 € |

<u>APPENDIX 2</u>

<u>CLAIMS FORM</u>

# GUARANTEE/CLAIMS FORM
## m/t "FS CHARLOTTE"

1.  **Claim No. 18 :  head office claim**    --

| 2. | Subject | Reduction gear breakdown |
|----|---------|--------------------------|
| 3. | Department | Technical department |
| 4. | Date of observation | 23 May 2008 |
| 5. | Date of informing the Company | 29 May 2008 |
| | | |
| 6. | Equipment | Main engine Reduction gear |
| 7. | Manufacturer | SCANA VOLDA |
| 8. | Drawing | VA204962 |
| 9. | Other indication | -------- |

10. **Description of defects, position etc.** (as many details as possible):

Complete breakdown of the reduction gear.
Housing destroyed.
Vessel must be towed to nearest port

11. **Necessary repairs** (done by the crew).
    NA

12. **Necessary repairs** (to be carried out by shore repair company; shipyard etc):

Scana Volda Technicians have been requested to come on board as soon as possible to check the reduction gear

13. **Spare Parts** (required/to order etc.):

According to Scana Volda inspection

Reported by:  A. Massot      Signature:      Date: **10 July 2008**

# EXHIBIT 5

**PS CHARLOTTE 17/08/2009 GEAR BOX BREAKDOWN**

| | | | Eur Amount | Invoice No | Payment date | Status | No | Exchange rate | |
|---|---|---|---|---|---|---|---|---|---|
| **H/M cover** | | | | | | | | | |
| **Definitive repairs & costs** | New gear box housing | 925,000.00 | 1172.2900.00 € | I80809/445 | 6/5/2008 Paid | 1 D | 1.5402 | $1,806,650.19 |
| | SOB | 1,868,646.56 | 2231.303.02 € | I80904/445 | 10/16/2008 Paid | 2 D | 1.3807 | $301,615.19 |
| Main Gear Wheels and spare parts | | 205,848.00 | 25,638.08 € | I80903/911 | 8/11/2008 Paid | 4 D | 1.5012 | $38,472.87 |
| Freight of defect parts | SOB | 2,595,322.67 | 313,916.93 € | I80904/591 | 7/10/2008 Paid | 4 D | 1.5708 | $493,100.71 |
| Pressure block | | 4,000.00 | 441.60 € | I80904/144 | 11/25/2008 Paid | 22 D | 1.2811 | $565.73 |
| | | 9,332.18 | 1,043.23 € | I80004/678 | 3/16/2008 Paid | 39 D | 1.3042 | $1,363.19 |
| **Barvill/ Port expenses Viana do Castelo** | | 1,133,173.50 | 128,161.92 € | I80804/851 | 4/7/2008 Paid | 52 D | 1.3246 | $169,763.28 |
| **SEA invest** | | | 77,453.41 € | 20943321/04 | 12/31/2008 paid | 7 D | 1.3917 | $107,791.91 |
| **SEA invest** | | | 15,472.48 € | CE657768 | 2/20/2009 paid | 33 D | 1.2591 | $19,481.40 |
| **SEA invest** | | | 753.00 € | CE657826 | 3/12/2009 paid | 42 D | 1.2782 | $962.48 |
| **SEA invest** | | | 2,599.37 € | CE657810 | 3/12/2009 paid | 43 D | 1.2782 | $3,207.48 |
| **SEA invest** | | | 2,936.13 € | CE662882 | 4/6/2009 paid | 50 D | 1.3496 | $3,962.50 |
| | General services | | 4,237.38 € | CE662907 | 4/24/2009 paid | 51 D | 1.3232 | $5,606.90 |
| | Gear box works | | 185,224.50 € | ENVC E081/7 | 8/14/2008 paid for 53/19 K€ | 8 D | 1.4907 | $156,858.16 |
| **Assistance remontage du réducteur Soana Volda** | | 293,330.00 € | ENVC E081/7 | 8/14/2008 paid for 53/19 K€ | 9 D | 1.4907 | $437,252.12 |
| | | 96,000.00 € | 9201/42 | 3/18/2009 Paid / 30 000 | 48 D | 1.313 | $39,390.00 |
| **Essais en mer à Marseille** | | 2,107.00 € | 200056005 | 3/24/2009 paid | 41 D | 1.3856 | $91,449.06 |
| **Intervention octobre 2008- Janvier 2009** | | 16,135.00 € | 908018 | 3/25/2009 paid | 38 D | 1.3607 | $2,845.92 |
| **Contrôles alignements au laser** | | 2,340.00 € | PC090007 | 3/23/2009 paid | 44 D | 1.3494 | $21,772.57 |
| | Bunker costs | 39,956.68 | 27,118.69 € | 08-678 | 9/10/2008 paid | 10 D | 1.3858 | $3,172.57 |
| | GALP energia | 30,722.71 | 21,177.16 € | 3310588401 | 9/23/2008 paid | 11 D | | $39,956.68 |
| | GALP energia | 53,407.31 | 22,670.20 € | 2350575457 | 9/1/2008 paid | 12 D | | $30,722.71 |
| | GALP energia | 35,558.24 | 31,752.00 € | 2350546190 | 8/13/2008 paid | 13 D | | $53,407.31 |
| | GALP energia | 34,751.74 | 21,707.60 € | 2350519937 | 7/17/2008 paid | 14 D | | $35,558.24 |
| | Ocean energy | 12,864.74 | 10,086.60 € | 200801067 | 2/13/2009 paid | 45 D | | $34,751.74 |
| | Lyondellbasell | 130,552.73 | 200601067 | 726129072 | 3/11/2009 paid | 46 D | 1.2786 | $12,864.74 |
| **Bunker regularisation CSSA** | | 68,233.59 | 51,291.19 € | 09-090 | 4/15/2009 paid | 47 D | | $166,924.72 |
| | Neale consulting Engineers | 2,990,000 GBP | 3,751.15 € | 08/1780.P770 | 10/17/2008 paid | 20 D | | $68,233.59 |
| | Neale consulting Engineers | 3,308.62 GBP | 3,525.33 € | 09/1800.P770 | 3/25/2009 paid | 49 D | 1.3464 | $5,028.04 |
| | Brookes Bell | 15,137.73 GBP | 17,157.73 € | B9630/01 | 12/30/2008 paid | 25 D | 1.3464 | $4,757.08 |
| | Brookes Bell | 1,953.30 GBP | 2,198.24 € | B9630/01 | 1/16/2009 paid | 26 D | 1.4698 | $24,188.97 |
| | Brookes Bell | 210.00 GBP | 243.16 € | B9659 | 7/31/2009 paid | 55 D | 1.327 | $2,917.06 |
| | Kong | | 50,000 € | B9659 | 7/16/2008 paid | 16 D | 1.4138 | $3,243.78 |
| | Total | £4,188.43 | 3,083.81 € | 70002398 | 10/6/2008 paid | 19 D | 1.5688 | $79,440.00 |
| | BV | | 9,997 € | 9168668 | | 53 D | | $4,188.43 |
| | WSG | | 3,534 € | 57P5 | 1/13/2009 paid | 23 D | 1.3262 | $4,686.79 |
| | WSG | | 5,952 € | 54P5 | 2/10/2009 paid | 27 D | 1.2967 | $7,317.96 |
| | WSG | | 61,138 € | 59P5 | 3/10/2009 paid | 32 D | 1.2783 | $7,846.21 |
| | WSG | | 4,836 € | 60P5 | 3/25/2009 paid | 35 D | 1.3494 | $6,525.70 |
| | | | | | | | | | **$2,649,344.71** |

| Provisional repairs & costs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Stand By pump & Starter | SOB | | 62,024.32 € | 1800004163 | 11/25/2008 Paid | 3 P | 1.2811 | $79,459.26 |
| | SOB | $61,814.50 | 10,200.80 € | 1800004399 | 7/10/2008 Paid | 5 P | 1.5708 | $16,023.41 |
| KAMAR / port expenses Gabes | | $81,411.00 | 8,909.31 € | 1800004016 | 9/12/2008 Paid | 6 P | 1.4066 | $12,531.83 |
| Assistance depose d'un réducteur Scania Valda | | $71,217.59 | 7,771.48 € | 45112008147o6efa | 12/5/2008 paid | 24 P | 1.2823 | $9,809.94 |
| | | | 13,560.00 € | 821670 | 3/16/2009 Paid | 28 P | 1.3042 | $17,424.11 |
| Works carried out in Viana do Castello | | | 5,928.50 € | T809901 | 2/10/2009 paid | 36 P | 1.2967 | $7,687.49 |
| Works carried out in Viana do Castello | | | 1,116.00 € | T808603 | 1/22/2009 paid | 37 P | 1.2984 | $1,449.01 |
| | | | 40,000 € | 1710/2909908 | 10/1/2008 paid | 17 P | 1.4081 | $56,324.00 |
| Lapssa tugs shipping | | | 45,105.20 € | | 10/8/2008 paid | 18 P | 1.3731 | $61,933.95 |
| Lapssa tugs shipping | BV | | 28,819 € | 8162469 | 1/13/2009 paid | 21 P | 1.3262 | $38,219.76 |
| | BV | | 2,807 € | 8165407 | 2/10/2009 paid | 31 P | 1.2967 | $3,639.84 |
| | | | | | | | | $304,502.70 |

$2,953,847.41

# EXHIBIT 6



*F O U Q U E T*
*S A C O P*
S.A.

## NOTICE OF DEFECTS & REPAIRS

### URGENT

YARDIMCI GEMI INSA A.S.
Aydintepe Mahallesi
Tersaneler Caddesi 50
Sokak No.7
81700 Tuzla
Istanbul
Republic of Turkey,

Attn: Huseyin Yardimci

Marseille, 17 June 2006

Dear Sirs,

*REF. FS CHARLOTTE ExHULL N°040*
*GUARANTEE UNDER ARTICLE IX*

We hereby refer to the acquisition contract dated 17 December 2003 (the "Acquisition Contract") entered into between FOUQUET SACOP SA as buyer (the "Buyer") and YARDIMCI GEMI INSA A.S. as builder (the "Builder") regarding the construction of a molten sulphur & asphalt tanker identified under Hull No 040 at time of construction and presently called as FS CHARLOTTE.

In compliance with provision of Article IX (Warranty of Quality) of the Acquisition Contract and further to:

(i)    our notice of defects dated 30th May 2006 with enclosures,

(ii)   our meeting dated 6th June 2006 in BAYONNE (FRANCE) with your guarantee engineer, Mr. GOKHAN KOGAR and

(iii)  the meeting held on 11th and 12th June in JORF LASFAR (MOROCCO) with your guarantee engineers, Mr. GOKHAN KOGAR and Mr. OSMAN YALMAN,

we hereby notify you that vessel FS CHARLOTTE will be in ST NAZAIRE Friday night 16th June 2006 (ETA) for repairs as discussed with your engineers and subcontractors.

10, place de la Joliette
Les Docks, Atrium 10.7
B P 24606
13567 Marseille Cedex 02

Tél. 33 (0) 4 95 09 31 40
Fax : 33 (0) 4 95 09 31 49    S.A. au capital de 5 000 000 E - siret 410 806 202 00025 - RCS Marseille B 410 806 202 - code NAF 671C

FF

2

You will find hereafter the details of the contemplated repairs as per quotation.

We ask you to attend theses repairs or confirm your comments on the way they will be carried out due to the fact that these defects fall within the scope of the guarantee of the Builder as per the Acquisition Contract.

The defects to date and proposed repairs are listed in Appendix 1 hereto together with the list of items/costs already borne by our company attached in Appendix 2 hereto

We would be very grateful if you could confirm your acceptance that all these items listed in Appendixes 1 and 2 hereto are covered under Article IX of the Construction Contract and therefore that the Builder will bear these costs by returning to my attention (ffievet@fsm.fr) a duly signed copy of this letter.

Yours faithfully,                           Confirmed and agreed for and on
                                            behalf of Yardimci Gemi Insa A.S


Frédéric Fievet                             Huseyin Yardimci

3

# APPENDIX 1

## LIST OF DEFECTS:REPAIRS WITH CORRESPONDING COSTS

## TO BE DONE

| FLAG / OCIMF/VARIOUS conditions | | | Following 06/04 & 12/06 survey on board. Clogging of lines & valves | | Yardirect / FS |
|---|---|---|---|---|---|
| **30 035 €** | **work** | **quotation** | | **Subcontractor** | **Comments** |
| OCIMF Mooring guideline compliance | Landmarks on winch (60% SWL) & windlass | 1 500 € | | Saint Nazaire Marine | supply only. Fitting by ship's staff |
| Flag condition to be closed | Fwd watertight door to be renewed | 200 € | | Saint Nazaire Marine | |
| Flag condition/BC to be closed 30/06/2006 | Cargo tank ventilation shall be useable (24h a day) at sea whatever condition: overhead by fwd mast | 6 545 € | | Saint Nazaire Marine | |
| Flag condition/BC to be closed 30/06/2006 | Void Space vent head filters | 2 100 € | | Saint Nazaire Marine | supply of 4 filters to be fitted by ship's staff |
| Flag condition to be closed 30/06/2006 | Fwd emergency ladder device | 200 € | | Saint Nazaire Marine | |
| Flag condition to be closed 30/06/2006 | gas detection: remote audible/visible alarm on bridge & pumproom | 17 390 € | | Shipelec | including Cable passage from LOOH to main deck and to bridge |
| Flag condition to be closed 30/06/2006 | upgrading of Pump room lighting/fan control (local switch on/off) | | | | |
| Flag condition to be closed 30/06/2006 | Upgrading of ligthing of Pumproom | | | | |
| BV control noise condition | Port Aft Fan noisy and air flow restricted by upper deck | 300 € | | Saint Nazaire Marine | |
| Void Space entrance limitation | remote control of void space high level alarm | 300 € | | Supply only (estimation) | fitting by ship's/ship's staff |
| Forecastle bilge system | Add Air driven bilge pump forward | 1 500 € | | Supply only (estimation) | fitting by ship's staff |
| Tank level system | SAAB SOB requested for adjustments | | | SAAB | Guarantee SOB via Yardirect |
| Propulsion plant regulation | MAK / SCANA SOB requested for adjustments | | | MAK / SCANA | Guarantee SOB via Yardirect |
| ME gear box driven pump failure | SCANA SOB requested for pump overhauling & gear box checking | | | SCANA | Guarantee SOB via Yardirect |

| Cargo Pumps plant as per spcification | | | 800 cbm/H disharging rate - Running in parallel - packing seals oil leakage - | | Following 06/04/06 Bayonne on board Meeting | Yardirect / FS / FG / BURGMAN |
|---|---|---|---|---|---|---|
| **72 328 €** | **work** | **quotation** | | **Subcontractor** | **Comments** | |
| | Non return Valve on head of pumps / supply | 6 203 € | | SPR | | |
| | Non return Valve on head of pumps / fitting | 4 430 € | | Saint Nazaire Marine | | |
| | Displacement Discharge valves of Cargo pumps | 8 613 € | | Saint Nazaire Marine | | |
| | Dismantling / Refitting of 4 inlet steel expansion joints | 980 € | | Saint Nazaire Marine | | |
| | Alteration / adjustment sealing oil line | 300 € | | Saint Nazaire Marine | | |
| | packing seal Spare parts | 43 600 € | | Burgman | renewal of 4 packing on each sulphur pump | |
| | Overhauling of Cargo pump packing Seat | 8 000 € | | Burgman SOB | 5 days at 750€ per days. | |
| | Overhauling of Cargo pump packing Seat | | | Burman / FG SOB | Guarantee SOB via Yardirect | |
| | Safety monitoring system on DP packing Seal / Inlet chamber | | | FG SOB | Guarantee SOB via Yardirect | |

4

| Thermal Oil Tracing system as per specification | Vessel to load/carry/discharge Asphalt at 250° & Molten Sulphur at 150° | | Following 06/08 & 12/08 survey on board. Clogging of lines & valves | Terchinei / FS / S MAN |
|---|---|---|---|---|
| 215 020 € | work | quotation | Subcontractor | Comments |
| Inadequate or missing tracing system on sulfur & Asphalt lines | Asphalt / Molten Sulphur Thermal Oil cargo linesTracing specialist to be used | 156 640 € | THERMEX | including supply / Engineering / BOB |
| sulfur & Asphalt line tracing renewal | Thermex tracing system fitting based on 2 X 80 ML on deck & on 2 X 40 ML in pump rooms as per Thermex | 16 380 € | Saint Nazaire Marine (estimation) | Based on 68,25€/ML |
| Secondary thermal Oil flow not sufficient for sulfur lines & valves external tracing | Primary thermal oil system to be permanently connected and secured (with two valves) to external tracing | 5 000 € | Saint Nazaire Marine (estimation) | |
| | Primary thermal oil on sulfur lines monitoring | 6 000 € | SHIPELEC (estimation) | PT 100 sensors on Thermal oil line |
| Missing Tracing of CT inlet lines in void spaces | Add THERMON system on 11 inlet lines (Void Spaces) | 30 000 € | THERMON (estimation) | Including BOB / fitting by ship's staff |

| Insulation of cargo lines, valves, as per standards | Vessel to load/carry/discharge Asphalt at 250° & Molten Sulphur at 150° | | Following 06/08 & 12/08 survey on board. Clogging of lines & valves | Not seaworthy insulation: cracks already reported. Several valves & lines not insulated |
|---|---|---|---|---|
| 69 252 € | work | quotation | Subcontractor | Comments |
| New insulation of cargo lines | 248 ML of cargo pipes insulation (deck and pump room) | 48 969 € | ARI | including technical file |
| | 13 cargo valves on deck insulation | 3 021 € | ARI | |
| | 15 ML tank vent line cracked insulation to be renewed (Front of FWD pump room) | 2 962 € | ARI | |
| | 23 Valves insulation in pump Room | 4 000 € | ARI | |
| | 4+2 filters insulation (pump room) | 2 000 € | ARI (estimation) | |
| | 11 ML cargo lines insulation in Void Spaces | 3 300 € | ARI (estimation) | |
| | Staging in pump Rooms | 5 000 € | ARI (estimation) | |

| Various Costs | TECHNICAL CALL COSTS | | | |
|---|---|---|---|---|
| 25 000 € | work | quotation | Subcontractor | Comments |
| | SV / Flag Survey | 5 000 € | | Estimation |
| | 15 D Technical call costs | 20 000 € | Berth chemical / ISPS / garbags / Pilot / Tug... | Estimation |

|  |  |
|---|---|
| PROV TOTAL | 411 633 € |
| ALREADY ENGAGED | 8 157 € | of attached file |
|  | 419 790 € |

5

# APPENDIX 2

## LIST OF DEFECTS/REPAIRS

## ALREADY INCURRED BY THE BUYER

Unforeseen - Technical

| DFS/RMS | Code FSM | Date DFS/RMS | Fournisseur | Montant Commande | Comments |
|---|---|---|---|---|---|
| CHA/RM-31/1 | 273 | 16/03/06 | SAAB ROSEMOUNT | € - | Gas detection commissioning (class condition) : charge, if any to be supported by Yardimci |
| CHA/RM-35/1 | 272 | 17/03/06 | SIEMENS | € - | Fire detection commissioning: charge, if any to be supported by Yardimci |
| CHA/RM-36/1 | 129 | 22/03/06 | THERMON | € 1 803,12 | permanent reenforcement of heating system after first loading test (clogging of Sulfur lines) |
| CHA/RM-48 / 1 | 710 | 07/04/08 | GONZALEZ & FILS | € 420,20 | Powre Pack Failure |
| CHA/RM-50 / 1 | 111 | 10/04/08 | PG Marine Groupe Ing Per Gjerdrum AS | € - | Cargo pump failure charge, if any to be supported by Yardimci |
| CHA/RM-55 / 1 | 111 | 18/04/08 | PG Marine Groupe Ing Per Gjerdrum AS | € - | Cargo pump failure charge, if any to be supported by Yardimci |
| CHA/RM-57 / 1 | 111 | 18/04/08 | PG Marine Groupe Ing Per Gjerdrum AS | € - | Cargo pump failure charge, if any to be supported by Yardimci |
| CHA/RM-51 / 1 | 210 | 25/04/08 | SAREM | € 2 790,00 | Anchor failures / primary heating on sulfur cargo lignes. |
| CHA/SIG/FE-33 / 1 | 130 | 05/04/08 | SPRI | € 1 454,80 | Various valves to connect primary thermal Oil on sulfur cargo pipes heating coils. |
| FREE INVOICE | 110 | 30/04/08 | ETNA | € 1 689,00 | Bridge equipment commissioning/defects |
| | | | ALREADY ENGAGED | € 8 157,12 | |



FOUQUET
SACOP s.a.

### NOTICE OF DEFECTS & REPAIRS

### URGENT

YARDIMCI GEMI INSA A.S.
Aydintepe Mahallesi
Tersaneler Caddesi 50
Sokak No.7
81700 Tuzla
Istanbul
Republic of Turkey,

Attn: Husseyin Yardimci

Marseille, 9 October 2006

Dear Sirs,

*REF. FS CHARLOTTE ExHULL N°040*
*GUARANTEE UNDER ARTICLE IX*

We hereby refer to the acquisition contract dated 17 December 2003 (the "Acquisition Contract") entered into between FOUQUET SACOP SA as buyer (the "Buyer") and YARDIMCI GEMI INSA A.S. as builder (the "Builder") regarding the construction of a molten sulphur & asphalt tanker identified under Hull No 040 at time of construction and presently called as FS CHARLOTTE.

We also hereby refer to:

- 85 guarantee claims already sent to your Office.

- Various exchanges with your Guarantee Engineer during signing on period (from 09/03/06 to 02/04/06). At this date, it was agreed to sign him off due to due to lack of cabins on board after Reinforcement of ship's staff by a necessary Painting & cleaning gang

- 30/05/2006 Statement of facts sent to Your Office.

- 06/06/2006 FS / YARDIMCI / PG / S MAN on Board meeting at Bayonne.

- 10/06 to 13/06 FS / YARDIMCI / S MAN on Board Survey at JORF LASFAR.

- 17/06/06 Notice of defects sent to your Office.

- 19/06/06 On Board meeting with FS / YARDIMCI / NAVYTECH at SAINT NAZAIRE as introduction of technical call.

- 26/06/2006 On Board Meeting FS / YARDIMCI for review of final list of works carried out at ST NAZAIRE.

- 14/07/2006 On board meeting FS / BORNMANN at JORF LASFAR.

Les Docks, Atrium 10.7 - 10, place de la Joliette - B.P. 24606 - 13567 Marseille Cedex 02
Tél. 33 (0) 4 95 09 31 40 - Fax : 33 (0) 4 95 09 31 49 - Télex : 440 460 SACOP
s.a. au capital de 5 000 000 € - siret 410 806 202 00025 - RCS Marseille 410 806 202 - code NAF 611A
n° identification intracommunautaire FR 56 410 806 202

2

- 11/08/2006 BORNEMANN Office Meeting FS / YARDIMCI / PG / BORNEMANN at OBERNKIRCHEN (GERMANY)

We hereby notify you that vessel FS CHARLOTTE is in ST NAZAIRE as from today's date for a ten-day period for repairs as discussed with your engineers and subcontractors.

You will find hereafter the details of the contemplated repairs as per quotation.

We ask you to attend theses repairs or confirm your comments on the way they will be carried out due to the fact that these defects fall within the scope of the guarantee of the Builder as per the Acquisition Contract.

The defects to date and proposed repairs are listed in Appendix 1 hereto.

We would be very grateful if you could confirm your acceptance that all these items listed in Appendix 1 hereto are covered under Article IX of the Construction Contract and therefore that the Builder will bear these costs by returning to my attention (ffievet@fsm.fr) a duly signed copy of this letter.

Yours faithfully,

Frédéric Fievet

Confirmed and agreed for and on behalf of Yardimci Gemi Insa A.S

Husseyin Yardimci

3

**APPENDIX 1**

**LIST OF DEFECTS AND REPAIRS WITH CORRESPONDING COSTS
TO BE DONE IN TECHNICAL CALL SCHEDULED IN OCTOBER**

| 62 382 € | FLAG / OCIMF/VARIOUS conditions | quotation | Subcontractor | Comments |
|---|---|---|---|---|
| St NAZAIRE OCT 06 | Landmarks on winch (60% SWL) & windlass | 2 300 € | Saint Nazaire Marine | |
| | Fwd watertight doors to be renewed | 1 500 € | Saint Nazaire Marine | |
| | main engine driven lub oil pump oil pipe to change | 2 376 € | Saint Nazaire Marine | |
| | Bow Thruster safe acces | 1 500 € | Saint Nazaire Marine | |
| | Drip tray pipes | 712 € | Saint Nazaire Marine | |
| | New "Bas JARRET" (1 mt to protect the crane) | 9 000 € | Saint Nazaire Marine | |
| | port and starboard winlass lignment / CL 014 | 30 000 € | Saint Nazaire Marine | |
| | COSTS OF TECHNICAL CALL (Pilot, Berth, ISPS, Chemical, Marpol...) | 15 000 € | SEA INVEST | |
| **266 912 €** | **Cargo Pumps plant as per specification** | **quotation** | **Subcontractor** | **Comments** |
| St NAZAIRE OCT 06 | upgrading sealing system according to bornemann recomm | 34 016 € | Per Gjerdrum AS | |
| | 4 elc motors 0,65kw for sealing pump & 1 fan cooling for PC Console | 3 350 € | Per Gjerdrum AS | |
| | 1 elec motor 17 kw for secundary thermal Oil pump | 1 765 € | Per Gjerdrum AS | |
| | Sealing Piping on sulfur pump & Bitumen pumps as per PG/ Bornemann recommendations (including air on tanks) | 17 848 € | Saint Nazaire Marine | |
| | Sealing Piping on Emergency sulfur pump as per PG/ Bornemann recommendations (including air on tanks) | 8 804 € | Saint Nazaire Marine | |
| | Isolating valves on sealing heater | 1 900 € | Saint Nazaire Marine | |
| | flushing of hydraulic lines and new sealing lines as per PG and Bornemann request | 6 000 € | Saint Nazaire Marine | |
| | "RODIA" Oil to be used for Molten sulphur cargo pump | 14 000 € | 7€ based 2000t | |
| | Overhauling of Cargo pump packing seals | 4 500 € | Service engineer on Board | |
| | packing seal Spare parts | 18 000 € | Burgmann | |
| | Check of Cargo pump bearing cooling cooling | | Per Gjerdrum AS | |
| | service on board for upgrading sealing system on mechanical seals and sensors on cargo lines | 18 000 € | bornemen, PG and burgman | |
| | fitting new cables, starters, for new electric motors, sensors | 41 764 € | SHIPELEC | |
| | parts for new starters and electric motors in place of hydraulic motor, Permanent problems with hydraulic control and speed on hydraulic motors | 45 338 € | SHIPELEC | CHA/SIE/FE/190 |
| | Fitting of elc motor on sealing pump / S MAN Pump (including bulkhead) | 7 500 € | Saint Nazaire Marine | |
| | 2 Bitumen Emergency Pumps | 25 600 € | BLACKMER | CHA/SIE/FE-95 |
| | Fitting of 2 Emergency Bitumen Pump | 1 850 € | Saint Nazaire Marine | |
| | suction and deliverypipes & valves modification for new bitumen cargo pumps | 10 575 € | Saint Nazaire Marine | |
| | 2 emergency flexible cargo hose, suction and delivery for emergency bitumen pumps | 6 000 € | BLOCKFLEX | |

ff

4

| 161 536 € | Thermal Oil Tracing system as per specification | quotation | Subcontractor | Comments |
|---|---|---|---|---|
| St NAZAIRE OCT 06 | 3 way valves to connect definitively primary thermal Oil on sulfur cargo pipes heating coils. | 7 306 € | SPRI | CHA/SIE/FE-88 |
| | shutdown valve between primary and secondary tracing system | 673 € | SPRI | CHA/SIE/FE-93 |
| | control of shutdown valve between primary and secondary tracing system | 141 € | SPRI | CHA/SIE/FE-93 |
| | fitting new HT 3 way valves on tracing system (including Shut Down) | 3 736 € | Saint Nazaire Marine | |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 100 009 € | THERMEX | CHA/SIE/FE-83 |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 12 041 € | THERMEX | CHA/SIE/FE-84 |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 16 794 € | THERMEX | CHA/SIE/FE-85 |
| | fitting tracing system bitumen and emergency sulphur | 13 708 € | Saint Nazaire Marine | |
| | connexion from thermex system to thermal oil system | 2 400 € | Saint Nazaire Marine | |
| | old heating coils to remove on bitumen cargo pumps rooms | 532 € | Saint Nazaire Marine | |
| | from cargo deck to fore and aft pump rooms, change steel pipes 3/4" to steel pipes 1" inlet outlet tracing pipe | 4 196 € | Saint Nazaire Marine | |

| 95 000 € | Insulation of cargo lines, valves as per standards | quotation | Subcontractor | Comments |
|---|---|---|---|---|
| St NAZAIRE OCT 06 | Cargo pipes & valves insulation finalization | 95 000 € | ARIS | |

| | | PROV TOTAL | 585 830 € |

# EXHIBIT 7

**ANNEX 1**

## TRACING SYSTEM

the tracing system designed by shipyard was based on wrong analyze that the molten sulphur is just circulating in cargo pipes. The very small pipes fitted as tracing system was working by radiation. All molten sulphur carriers are fitted with full steam tracing system.

| Location | Description | Amount | Company | Reference | Annex | N° |
|---|---|---|---|---|---|---|
| Bayonne 1903 | Reactivation of heating system after first floating test (scrapping of Sulfur lines) | 1,903.14 € | THERMON | THERMON N° 140500/019 | TRA | 1 |
| ST NAZAIRE 16/06 to 20/06 | heating system on sulphur cargo pipes filters | 1,100.00 € | THERMON | THERMON N° 140/06/0218 | TRA | 2 |
| ST NAZAIRE 16/06 to 28/06 | heating system on sulphur cargo pipes filters | 10,794.00 € | THERMON | THERMON N° 140/06/0230 | TRA | 3 |
| BAYONNE 19/03 | Primary heating on sulfur cargo lignes. | 695.00 € | SAREM | Sarem 5° 604/024 | TRA | 4 |
| BAYONNE 19/03 | Various valves to connect primary thermal Oil on sulfur cargo pipes heating coils | 1,454.80 € | SPRII | SPRII N° F6049/042 | TRA | 5 |
| ST NAZAIRE 16/06 to 26/06 | Various valves to connect in anticipating primary thermal Oil on sulfur cargo pipes heating coils FE 2341 | 1,000.00 € | SPRII | SPRII N° F6046/426 | TRA | 6 |
| ST NAZAIRE 16/06 to 26/06 | parts for check valves on main cargo pumps delivery. To maintain mini diff P between pump and mesh sizes | 1,691.00 € | SPRII | SPRII N° F6046/055 | TRA | 7 |
| ST NAZAIRE 16/06 to 26/06 | 3 way valves to connect primary thermal Oil on sulfur cargo heating coils | 3,398.40 € | SPRII | SPRII N° F6046/415 | TRA | 8 |
| ST NAZAIRE 16/09 to 28/06 | high T° gasket for tracing & check valves | 676.00 € | SPRII | SPRII N° F6080/219 | TRA | 9 |
| ST NAZAIRE 16/06 to 28/06 | high T° gasket for tracing & check valves | 255.00 € | SPRII | SPRII N° F6080/219 | TRA | 10 |
| ST NAZAIRE except for bitumen line in CPR | tracing system on sulfur & Asphalt lines | 112,633.00 € | THERMEX | THERMEX N° 18010 | TRA | 11 |
| ST NAZAIRE except for bitumen line in CPR | tracing system on sulfur & Asphalt lines | 21,742.85 € | THERMEX | THERMEX N° 18794 | TRA | 12 |
| ST NAZAIRE except for bitumen line in CPR | tracing system on sulfur & Asphalt lines | 3,400.00 € | THERMEX | THERMEX N° 18149 | TRA | 13 |
| ST NAZAIRE except for bitumen line in CPR | tracing system on sulfur & Asphalt lines | 10,400.00 € | THERMEX | THERMEX N° 18009 | TRA | 14 |
| ST NAZAIRE except for bitumen line in CPR | Tracing system on sulfur & Asphalt lines | 33,907.00 € | THERMEX | THERMEX N° 18007 | TRA | 15 |
| ST NAZAIRE except for bitumen line in CPR | Two hot tracing systems fitting based on 2 X 60 kW on deck & on 1 X 42 kW pump heater as per Thermex | 16,380.00 € | Saint Nazaire Marine | N°04-6-1267 | TRA | 16 |
| ST NAZAIRE 16/06 to 28/06 | Lifting device | 412.00 € | Saint Nazaire Marine | N°04-6-1267 | TRA | 16 |
| ST NAZAIRE 16/06 to 28/06 | Dismantling / cutting of previous tracing | 2,500.00 € | Saint Nazaire Marine | N°04-6-1267 | TRA | 16 |
| | PTFE supply to insulate pipes and support | 1,080.00 € | Saint Nazaire Marine | N°04-6-1267 | TRA | 16 |
| | Bulkhead penetration in FWD and AFT zero room thread | 910.00 € | Saint Nazaire Marine | N°04-6-1267 | TRA | 16 |

| Group | Description | Amount | Company | Reference | | No. |
|---|---|---|---|---|---|---|
| ST NAZAIRE except for bitumen line in CPR | Adjustment to cargo pipes of THERMEX tracing | 10,060.00 € | Saint Nazaire Marine | N°06-4-1247 | TRA | 15 |
| ST NAZAIRE except for bitumen line in CPR | Adjustment to cargo pipes of THERMEX tracing | 3,500.00 € | Saint Nazaire Marine | N°06-4-1247 | TRA | 16 |
| ST NAZAIRE except for bitumen line in CPR | Adjustment to cargo pipes of THERMEX tracing | 4,200.00 € | Saint Nazaire Marine | N°06-4-1247 | TRA | 16 |
| ST NAZAIRE except for bitumen line in CPR | Adjustment to cargo pipes of THERMEX tracing | 1,750.00 € | Saint Nazaire Marine | N°06-4-1247 | TRA | 16 |
| ST NAZAIRE except for bitumen line in CPR | Isometric drawings | 2,525.00 € | Saint Nazaire Marine | N°06-4-1267 | TRA | 16 |
| ST NAZAIRE except for bitumen line in CPR | Overtime (to perform 12 D window) | 7,585.00 € | Saint Nazaire Marine | N°06-4-1267 | TRA | 15 |
| ST NAZAIRE 1/6/06 to 29/06 | Various supply | 1,212.00 € | Shipetec | N°2006/06/78 | TRA | 27 |
| | Primary thermal oil on sulfur lines monitoring (PT 1000 sensor) | 2,342.00 € | SPPI | N° F06/01/75 | TRA | 28 |
| | 3 Way valves to connect emergency tracing to main tracing | 673.86 € | SPPI | N° F99/01/67 | TRA | 29 |
| | shutdown valve between primary and secondary tracing system | 141.66 € | SPPI | N°F06/01/66 | TRA | 30 |
| | Barring area HT 3 way valves on tracing system (including Shut Down) | 5,100.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | Being Shut Down valve | 832.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | welding of go room bulkhead for tracing | 176.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 101,439.56 € | THERMEX | N° 2006/0016 | TRA | 34 |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 12,041.00 € | THERMEX | N° 2006/0015 | TRA | 35 |
| | Tracing system bitumen pipes in pump room and emergency sulphur pipes | 167,744.00 € | THERMEX | N° 2006/0013 | TRA | 36 |
| | Slow tracing system bitumen and emergency sulphur pipes | 13,707.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | connexion from thermex system to thermal oil system | 2,700.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | old heating coils to remove on bitumen cargo pumps roofing | 552.00 € | Saint Nazaire Marine | bov N° 06 10 1509 | TRA | 31 |
| | various spare for work, spool, flanges, screw... | 3,520.00 € | THERMEX CSI | 2006/06/022/2006/0023 | TRA | 43 |
| ST NAZAIRE OCT 06 | New emergency pump | 8,400.00 € | THERMEX CSI | | TRA | 43 |
| | Cargo pipes & valves insulation | 46,526.00 € | ARIS | bov N° 812 11 | TRA | 45 |
| | Cargo pipes & valves insulation | 61,960.68 € | ARIS | 64607 | TRA | 46 |
| ST NAZAIRE except for bitumen line in CPR | Cargo pipes & valves insulation | 33,000.00 € | ARIS | 60/62S | TRA | 47 |
| ST NAZAIRE except for bitumen line in CPR | Cargo pipes & valves insulation | 13,897.00 € | ARIS | bov N° 62626 | TRA | 48 |
| **TOTAL TRA** | | **572,534 €** | | | | |

## AUT CONDITIONS

| | Items according to class, flag authority and vetting regulation or requirement | | | | | |
|---|---|---|---|---|---|---|
| ST NAZAIRE 16/06 to 28/06 | Cargo tank ventilation shall be assessed (2/Hr a day) at sea whatever condition, ventilated by fwd mast staff | 4,350.00 € | Saint Nazaire Marine | N°06-4-1267 | AUT | 16 |
| ST NAZAIRE 16/06 to 28/06 | Void Spaces supply of 4 x vent head filters to be fitted by ship's staff | 2,100.00 € | Saint Nazaire Marine | N°06-4-1267 | AUT | 16 |
| ST NAZAIRE 16/06 to 28/06 | Fwd emergency ladder device | 960.00 € | Saint Nazaire Marine | N°06-4-1267 | AUT | 16 |
| ST NAZAIRE 16/06 to 28/06 | gas detection: remote audible/visible alarm on bridge & pumproom | 11,762.00 € | Shipalec | N°206494568 | AUT | 51 |
| ST NAZAIRE 16/06 to 28/06 | PC Cargo / PC ENGINE / Bridge connection | 3,500.00 € | Shipalec | N°206494668 | AUT | 52 |
| ST NAZAIRE 16/06 to 28/06 | upgrading of Pump room lighting/fan control (book switch on/off) | 4,523.60 € | Shipalec | N°206494669 | AUT | 53 |
| ST NAZAIRE 16/06 to 28/06 | Upgrading of lighting of Pumproom bottom level | 4,093 € | Shipalec | N°206494670 | AUT | 54 |
| ST NAZAIRE 16/06 to 28/06 | shutdown alarm on cargo fans IBC code | 5,416.00 € | Shipalec | N°206494675 | AUT | 55 |
| ST NAZAIRE 16/06 to 28/06 | New relay panel for remote alarms | 1,195.00 € | Shipalec | N°206494671 | AUT | 56 |
| ST NAZAIRE 16/06 to 28/06 | visual & audible remote alarms | 190.00 € | Shipalec | N°206494677 | AUT | 57 |
| ST NAZAIRE 16/06 to 28/06 | engineering and technical file for ER and bench flag | 2,006.50 € | Shipalec | N°205000673 | AUT | 58 |
| BAYONNE 1903 | Bridge equipment commissioning/defects | 1,699 € | ETNA | ETNA N°FC01567 | AUT | 59 |
| ST NAZAIRE 29/06 | Bridge equipment commissioning/defects | 776 € | ETNA | ETNA N°FC01990 | AUT | 60 |
| ST NAZAIRE 29/06 | Lanchworks scr winch (60% SWL) & windlass | 0.00 € | Saint Nazaire Marine | DOVE free OC | AUT | |
| 5a NAZAIRE OCT 06 | Fwd watertight doors to be renewed | 0.00 € | Saint Nazaire Marine | DOVE free OC | AUT | |
| | Bow Thruster safe access | 0.00 € | Saint Nazaire Marine | NOT TO BE DONE | AUT | |
| | pipe to stco | 1,850 € | Saint Nazaire Marine | inv N°06 10 1599 | AUT | 31 |
| **TOTAL AUT** | Cargo ship tray cargo pipes and valves | 999.00 € | Saint Nazaire Marine | inv N°06 10 1599 | AUT | 31 |

**TOTAL AUT    44,872 €**

# CARGO PUMP SYSTEM

wrong commissioning of cargo pump mechanical seals, incorrect design ng cargo piping (no check valves at delivery pumps). Wrong quality of sealing piping. Wrong (cheap) design of a comnuun sealing system between motion sulphur, bitumen, emergency pumps. Due to wrong hydraulic control design, no constant speed and no constant T° on sealing oil system.

| Location / Date | Description | Amount | Supplier | Ref / Invoice | | No. |
|---|---|---|---|---|---|---|
| Bayonne 1963 | commissioning during first call, parameters adjustment. | 4,433.00 € | Per Gjerdrum AS | Invoice PO 17610 CRA 35 EF E 901 | PUM | 66 |
| Bayonne 1304 & 164PA | Cargo pump failure. | 17,774.00 € | Per Gjerdrum AS | Invoice PO N°46661 CRA RM 501 | PUM | 67 |
| bayonne 8/07 | 2 thermometers | 740.00 € | Per Gjerdrum AS | invoice PO N°8866 | PUM | 68 |
| bayonne ts prof 08/07/06 to 21/07/06 | breakdown on all sulphur pp change mech seals, spare parts, not commissioning | 18,742.00 € | Per Gjerdrum AS | CRA E 35 | PUM | 69 |
| Delivery Bayonne 8/07 | 2 sealing Oil pump (following sulphur leakkage) | 2,100.00 € | Per Gjerdrum AS | invoice PO N°49990 | PUM | 70 |
| Bayonne 09/06 | hydraul pump valve + SOB | 5,960.00 € | Per Gjerdrum AS | N° 49989 CRA RM 131 | PUM | 71 |
| Bayonne 09/06 | Hydraul Motor Parker for S MAN Pump | 1,282.34 € | AGA | 1007777 | PUM | 72 |
| ST NAZAIRE 16/06 to 28/06 | Non return Valve on head of pumps / fitting | 6,540.00 € | Saint Nazaire Marine | N°64+1267 | PUM | 16 |
| ST NAZAIRE 16/06 to 28/06 | Displacement/ Discharge valves of Cargo pumps | 8,470.00 € | Saint Nazaire Marine | N°64+1267 | PUM | 16 |
| ST NAZAIRE 16/06 to 28/06 | Dismantling / fiddling of 4 inlet stud expansion joints | 980.00 € | Saint Nazaire Marine | N°96+1747 | PUM | 16 |
| ST NAZAIRE 16/06 to 28/06 & BAYONNE 8/07 | SOB | 1,056.95 € | Burgmann | N°47235 | PUM | 76 |
| ST NAZAIRE 16/06 to 28/06 & BAYONNE 8/07 | SOB | 4,471.00 € | Burgmann | N°47299 | PUM | 77 |
| ST NAZAIRE 16/06 to 28/06 & BAYONNE 8/07 | FWD Sulfur Cargo pump major leakkage / first damaging. Change of 4 mec. Seals. | 7,020.79 € | Burgmann | N°93222 | PUM | 78 |
| ST NAZAIRE 16/06 to 28/06 & BAYONNE 8/07 | Sulfur Cargo pump major leakkage mechanichal seals repaire | 22,106.00 € | Burgmann | N°92574 | PUM | 79 |
| ST NAZAIRE 16/06 to 28/06 & BAYONNE 8/07 | spare for mech seals repaire | 15,697.20 € | Burgmann | N°95854 | PUM | 80 |
| | various spare parts after breakdowns | 3,070.00 € | Burgmann | N°99285 | PUM | 81 |
| | Mecanical seals to review | 3,846.00 € | Burgmann | N°92950 | PUM | 82 |
| | Mecanical seals parts | 20,824.00 € | Burgmann | N°16530 | PUM | 83 |
| | Sulfur Cargo pump major leakage. Change of 4 mec. Seals. | 16,360.00 € | Burgmann | N° 16330 | PUM | 84 |
| | Sulfur Cargo pump major leakkage. Change of 4 mec. Seals. | 16,384.00 € | Burgmann | N° 94421 | PUM | 85 |
| | Spare for mechanicals seals | 18,816.00 € | Burgmann | CRA 852/F3-119-1 (deuxeq) | PUM | 86 |
| | Mecanical seals to review | 19,317.16 € | Burgmann | N° 110016 | PUM | 88 |
| | Mecanical seals repair | 7,635.00 € | Burgmann | FAC 07/723 | PUM | 89 |
| | Mecanical seals sulfur pump to review | 6,550.00 € | | | PUM | 91 |
| | Mechanicas seals blumen pump to review | 9,660.00 € | | 309071 / 309976 | PUM | 92 |

St NAZAIRE OCT 06

| Description | Amount | Company | Reference | Code | No |
|---|---|---|---|---|---|
| Service on board and basal 2nd tech stop | 22,584.00 € | | 90217 | PUM | 95 |
| Electric motor 17 KW | 2,285.00 € | Per Gjertsen AS | 90518 | PUM | 96 |
| 4 etc. motors 0.66kw for sealing pump & 1 fan cooling for PC Consoop | 3,550.00 € | Per Gjertsen AS | 90540 | PUM | 97 |
| Service and spare part St Nazaire technical stop | 45,543.00 € | Per Gjertsen AS | 300036 | PUM | 100 |
| new union on mechanical seals cargo main and emergency pumps | 530.00 € | SPRI | DNV N° f9e01884 | PUM | 101 |
| Sealing Piping on sulvr pump as per PGI Bornemann recommendations (including air on tanks) | 17,880.00 € | Saint Nazaire Marine | inv N° 06 10 1609 | PUM | 31 |
| Sealing Piping on Blumen pumps as per PGI Bornemann recommendations (including air on tanks) | 15,556.00 € | Saint Nazaire Marine | inv N° 06 10 1608 | PUM | 31 |
| Sealing Piping on Emergency sulur pump as per PGI Bornemann recommendations (including air on tanks) | 12,265.00 € | Saint Nazaire Marine | inv N° 06 10 1599 | PUM | 31 |
| flushing of hydraulic lines and new sealing lines as per PGI and Bornemann Report | 6,912.00 € | Saint Nazaire Marine | inv N° 06 10 1599 | PUM | 31 |
| piping and sealing valves on cargo pump hydraulic system | 6,527.00 € | Saint Nazaire Marine | inv N° 04 10 1596 | PUM | 31 |
| 'RHODIA' Oil for Molten sulphur cargo pump first delw | 5,700 € | RHODIA SILICONE | inv No 9983473 | PUM | 31 |
| Blumen cargo pumps Service On Board for commissioning | 7,682.00 € | Per Gjertsen AS | inv No 76391 | PUM | 102 |
| fitting new cables, sliemen, for new electric motors, sensors | 78,662.00 € | SHIPELEC | EXCLUDED EN N° 3006t01150 | PUM | 103 |
| grids for new stators and electric motors in place of hydraulic motor. Permanent problems with hydraulic control and speed on hydraulic motors | 0.00 € | SHIPELEC | EXCLUDED EN N° 3006t01150 | PUM | 109 |
| completion of commasioral tests approbations for electric motors | 2,972.00 € | SHIPELEC | DNV N° 3006t01487 | PUM | 111 |
| piping for new sensors | 1,160.00 € | Saint Nazaire Marine | inv N° 06 10i 1599 | PUM | 31 |
| 2 Blumen Emergency Pumps | 25,600.00 € | BLACHMER | N° AA000258 CHAOBSF15-98 | PUM | 113 |
| flanges for modification emergency piping | 1,319 € | SPRI | N° f09i0168 | PUM | 114 |
| gaskets in H T | 332.00 € | S P R E | N° 2699579 | PUM | 115 |
| Fitting of 2 Emergency Blumen Pump | 3,548 € | Saint Nazaire Marine | inv N° 06 10 1599 | PUM | 31 |
| suction and deliverypipes & valves modification for sulphur pipe & blumen segregation | 7,322.00 € | Saint Nazaire Marine | inv N° 06 10 1599 | PUM | 31 |
| bottom common cargo piping modification for new bluman cargo pumps | 0.00 € | | EXCLUDED | PUM | 31 |

| Description | Price | Supplier | Reference | | No. |
|---|---|---|---|---|---|
| 2 emergency flexible cargo hose, suction and delivery for emergency bitumen pump | 5,256 € | BLOOM-EX | CHA-SEE RE 167 | PUM | 119 |
| Cargo pump screw transport and packaging | 1,518.00 € | Saint Nazaire Marine | Dev N° 66 10 1599 | PUM | 31 |
| shipped logistic | 2,132.00 € | Saint Nazaire Marine | Dev N° 06 10 1509 | PUM | 31 |
| Fitting of elec motor on sealing pump / S MAN Pump (including bulkhead) | 5,450.00 € | ENVIC | Inv No 2d 090 110 | PUM | 120 |
| Bolt for check valves | 1,170.00 € | SPRI | N° FI606161 partial | PUM | 125 |
| sealing piping to change / renew after breakdown | 4,850.00 € | SAREM | Siemn N° 664357 | PUM | 126 |
| engineer on board | 300.00 € | SAREM | Siemn N° 664028 | PUM | 4 |
| Sealing system | 426.21 € | Gonzales & fils | CHA-RM-178 | PUM | 128 |
| Sealing piping insulation | 615.14 € | ARIS | 61779 | PUM | 129 |
| services and part for sealing piping after breakdown | 2,790.00 € | SAREM | Siemn N° 664028 | PUM | 4 |
| TOTAL PUM | 533,849 € | | | | |

## VARIOUS

| Project | Description | Amount | Supplier | Reference | Type | No. |
|---|---|---|---|---|---|---|
| BAYONNE 2004 | Power Pack Failure | 428.23 € | Sozzakra & Ita | CRA/SRA-Ibi 1 | VAR | 131 |
| ST NAZAIRE 16/08 to 28/06 | Engine Fan change cover fitting | 1,690.00 € | Saint Nazaire Maine | S?Ok4-1367 | VAR | 16 |
| ST NAZAIRE 16/05 to 28/06 | Port Aft Fan recep and air flow restricted by upper deck | 1,216 € | Shipvec | N°28065/66072 | VAR | 16 |
| ST NAZAIRE 16/05 to 28/06 | engine exon fan cables and wiring on starboard side and port side | 4,160.00 € | | | VAR | 134 |
| ST NAZAIRE 16/05 to 28/06 | Engine Port Fan change cover (titt down) | 4,733.00 € | Emg (supply only) | JENAG.S° 17396 | VAR | 135 |
| ST NAZAIRE 16/05 to 28/06 | SCANA 8208 | 9,154.41 € | SCANA VOLDA N°11808124 | | VAR | 137 |
| ST NAZAIRE + Transit to Bayonne | gear pump for reduction gear opam head office pa | 3,287.75 € | SCANA VOLDA N°11808131 | | VAR | 138 |
| ST NAZAIRE + Transit to Bayonne | Claim 67 / Actuator for 3 W valve air cooler ME | 1,132.0 € | PLEDGER | CRA.5R/-I.P? | VAR | 139 |
| BAYonne Sept 05 | Fixed gas detection repair | 4,774.94 € | Consilium | | VAR | 140 |
| | Paint supply | 2,259.40 € | HEMPEL | HEMPEL n° 15404 | VAR | 141 |
| | Paint supply | 532.00 € | HEMPEL | HEMPEL N° 151869 | VAR | 142 |
| | Paint supply | 822.00 € | HEMPEL | HEMPEL N° 151890 | VAR | 143 |
| | Paint supply | 1,990.00 € | HEMPEL | HEMPEL N° 151982 | VAR | 144 |
| | Paint supply | 822.00 € | HEMPEL | HEMPEL N° 151929 | VAR | 145 |
| | Paint supply | 794.40 € | HEMPEL | HEMPEL N° 152295 | VAR | 146 |
| | Paint supply | 604.80 € | HEMPEL | HEMPEL N° 151892 | VAR | 147 |
| | Paint supply | 694.80 € | HEMPEL | HEMPEL N° 151942 | VAR | 148 |
| | Paint supply | 120.00 € | HEMPEL | HEMPEL N° 1517777 | VAR | 148 bis |
| | Paint supply | 168.00 € | HEMPEL | HEMPEL N° 152627 | VAR | 149 |
| | Paint supply | 505.60 € | HEMPEL | HEMPEL N° 152690 | VAR | 150 |
| | Paint supply | 1,014.40 € | HEMPEL | HEMPEL N° 152668 | VAR | 151 |
| | Paint supply | 3,224.00 € | HEMPEL | HEMPEL N° 152253 | VAR | 152 |
| | Paint supply | 924.00 € | HEMPEL | HEMPEL N° 166019 | VAR | |
| | Paint supply | 1,632.00 € | HEMPEL | HEMPEL N° 152255 | VAR | 153 |

| Description | Amount | Supplier | Reference | | No. |
|---|---|---|---|---|---|
| Paint supply | 159.00 € | HEMPEL | HEMPEL N° 156256 | VAR | 154 |
| Paint supply | 4,041.80 € | HEMPEL | HEMPEL N° 151986 | VAR | 155 |
| Paint supply | 105.45 € | HEMPEL | HEMPEL N° 153485 | VAR | 156 |
| Paint supply | 248.96 € | HEMPEL | HEMPEL N° 152294 | VAR | 157 |
| Paint supply | 505.80 € | HEMPEL | HEMPEL N° 152898 | VAR | 158 |
| Paint supply | 2,240.09 € | HEMPEL | HEMPEL N° 152898 | VAR | 31 |
| main engine driven fuel oil pump, oil pipe to change | 670.00 € | Saint Nazaire Marine | Inv N° 06 10 1569 | VAR | 31 |
| New "Bas JARRET" (1 mt only to protect the crane) | 8,190.00 € | Saint Nazaire Marine | inv N° 06 10 1509 | VAR | 31 |
| Earth fault on main switch board | 978.00 € | SHIPELEC | INV N° 2006/01166 | VAR | 163 |
| Audible alarms CO2 EEXHORNS | 2,764.00 € | SHIPELEC | INV N° 2006/01169 | VAR | 164 |
| Earth fault on main switch board | 3,334.00 € | SHIPELEC | | VAR | 165 |
| modifications and new bypass emergency transfer lines | 5,740.00 € | Saint Nazaire Marine | inv N° 06 10 1509 | VAR | 31 |
| cargo tanks vent pipes modifications | 3,180.00 € | Saint Nazaire Marine | inv N° 06 10 1509 | VAR | 31 |
| adjustment and repair gyro console | 2,058.00 € | ETNA | FC 010416 | VAR | 168 |
| crane failure examination to dispatch | 805.00 € | general diffusion | 591/2006 | | 171 |
| CLASS CONDITION | 1,889.00 € | BV | inv N° 60000/64 | VAR | 173 |
| Port call expenses + agency fees, Juris etc | 16,215.62 € | Sea invest | | VAR | 174 |
| Bucking hydrolic piping | 498.86 € | GEKVESPOTITIER | Order # CHASSIS/FG=727 | VAR | 175 |
| Boiler circulating pump | 1,461.00 € | COLFAX | inv N° 62602364 | VAR | 176 |
| Boiler circulating pump | 4,186.00 € | COLFAX | inv N° 62601599 | VAR | 177 |
| crane failure | 1,125.00 € | Grues Leporte | inv N° FA.1161 | VAR | 179 |
| crane failure | 2,615.78 € | ACCACIA | Fcle 40.03.06 | VAR | 180 |
| crane failure | 1,087.83 € | bv | inv N° 60723776 | VAR | 181 |
| Cleaning accommodation and pump room | 227.32 € | UNITOR | 29C02MJ76 | | 184 |

| Location | Description | Amount | Supplier | Order / Ref No | Type | No |
|---|---|---|---|---|---|---|
| Bayonne | Cleaning accommodation and pump rooms | 239,00 € UNITOR | | 2NO326390 | VAR | 185 |
| Bayonne | Anchor scheduled break down | 310,00 € SAREM | | Sares N° 664623 | VAR | 4 |
| Bayonne | Catwalk on deck hydrelic piping | 1,200.00 € SAREM | | Sares N° 69445 | VAR | 187 |
| Bayonne | Catwalk on deck piping | 1,480.00 € SAREM | | Sares N° 66441 | VAR | 183 |
| Bayonne | Display manifold | 600.00 € SAREM | | Sares N° 69016 | VAR | 189 |
| Bayonne | Display manifold | 700,00 € SAREM | | Sares N° 69046 | VAR | 190 |
| Bayonne | Cargo reducer welding | 1,090.00 € SAREM | | Sares N° 69017 | VAR | 191 |
| Viana do Castelo | CL 014 starboard exhaust sigment | 15,800.00 € ENRM | | Soc No 249 099 110 | VAR | 120 |
| Viana do Castelo | CL 014 port exhaust sigment | 30,000.00 € | Sof Moteurs | | VAR | 120 |
| Marseilles | Claim Cefrex | 2,634.00 € ESPRI | | Invoice to be received | VAR | 193 |
| 2nd twin stop | High temperature thermal for valves | 2,400.00 € ESPRI | Siemens | N° 69419250 | VAR | 194 |

**TOTAL VAR    181,054 €**

## INSULATION

very bad quality of the protection of the piping insulation. MUST BE DONE

| | | | Type | No |
|---|---|---|---|---|
| thermal oil bitumen primary | | ENVC | INS | 120 |
| thermal oil cargo tanks with valves boxes | | ENVC | INS | 120 |
| very poor molten sulphur cargo tanks | | ENVC | INS | 120 |
| reeing circulation | | ENVC | INS | 120 |
| reeing supply & distribution | | | INS | 120 |

**TOTAL INS    0 €    166,750.00 €**

ENGAGED BY FSM FOR REPAIR

| | |
|---|---|
| TRACING | 572,534 € |
| AUT CONDITIONS | 44,872 € |
| PUMPS | 533,849 € |
| VARIOUS | 181,054 € |
| INSULATION | 166,750 € |
| **TOTAL** | **1,499,058 €** |

# EXHIBIT 8



*F O U Q U E T*
*S A C O P*
*S.A.*

YARDIMCI GEMI INSA A.S.
Aydintepe Mahallesi
Tersaneler Caddesi 50
Sokak No.7
81700 Tuzla
Istanbul
Republic of Turkey,

Attn: Husseyin Yardimci

Marseille, 5 February 2009

Dear Sirs,

### *REF. FS CHARLOTTE ExHULL N°040*
### *GUARANTEE UNDER ARTICLE IX*

We hereby refer to:

> ➤ the acquisition contract dated 17 December 2003 (the "Acquisition Contract") entered into between FOUQUET SACOP SA as buyer (the "Buyer") and YARDIMCI GEMI INSA A.S. as builder (the "Builder") regarding the construction of one molten sulphur & asphalt tanker identified under Hull No 040 at the time of construction and presently known as FS CHARLOTTE;

> ➤ Minutes of a meeting in Bayonne dated 6 June 2006 (a copy of which is attached);

> ➤ Our Guarantee survey report dated 11 & 12 June 2006 in Jorf Lasfar (a copy of which is attached hereto);

> ➤ Our notice of defects dated 17 June 2006 (a copy of which is attached hereto);

> ➤ Our minutes of a meeting dated 19 June 2006 in Saint Nazaire (a copy of which is attached hereto);

> ➤ Our notice of defects dated 9 October 2006 (a copy of which is attached hereto);

> ➤ Our minutes of meeting dated 5 & 6 November 2006 (copy of which is attached hereto); and

> ➤ Our claims No 2 and No 14, re-issued on 5 September 2008, upon completion of corresponding repairs.

All corresponding claims have been addressed to your guarantee department in due time as per the Acquisition Contract.

As of the date hereof, we have not received any answer from you in respect of these claims, and your confirmation that they fall within the scope of the contractual guarantee.

112, bd des Dames
B.P. 24606
13567 Marseille Cedex 02

**Tél. 33 (0) 4 95 09 31 40**
Fax : 33 (0) 4 95 09 31 49        s.a au capital de 5 000 000 € - siret 410 806 202 00025 - RCS Marseille B 410 806 202 - code NAF 671C

A breakdown of the costs of the repairs (with corresponding invoices) is attached in Appendix 1 hereto.

We now call upon you to confirm that you accept responsibility for the defects referenced herein and for the costs of all of the repairs in respect of such defects. Please confirm the same prior to close of business on 26 February 2009.

We should be grateful if you would also now send us payment in respect of these repairs, in the amount of EUR 1.499.058, corresponding to the actual costs borne by Fouquet Sacop for the repairs of the defective equipment on board FS CHARLOTTE. Please confirm that you will settle the same, also prior to close of business on 26 February 2009, and we shall be happy to provide you with bank details.

All of Buyers' legal rights and remedies arising under the Acquisition Contract or otherwise are hereby fully reserved.

Yours faithfully

Christian Rouland

# EXHIBIT 9

# ∧ NORTON ROSE

27 February 2009

**Private and Confidential**

Mr. Husseyin Yardimci
Yardimci Gemi Insa A.S.
Aydintepe Mahallesi
Tersaneler Caddesi 50
Sokak No.7
81700 Tuzla
Istanbul

**By e-mail and by courier**

Norton Rose LLP
3 More London Riverside
London  SE1 2AQ
United Kingdom

Tel  +44 (0)20 7283 6000
Fax +44 (0)20 7283 6500
DX 85 London
www.nortonrose.com

Your reference

Direct line
+44 (0)20 7444 2698

Our reference
DZPP/148/LN19892

Email
chris.hobbs@nortonrose.com

Dear Sirs

## *ST Charlotte* - outstanding warranty claims under Acquisition Agreement dated 17 December 2003

We are London solicitors instructed to act on behalf of Fouquet Sacop S.A. in respect of their dealings with Yardimci Gemi Insa A.S., arising out of the Acquisition Contract dated 17 December 2003 for the purchase of the vessel, *ST Charlotte* (formerly the *FS Charlotte*). As you will be aware, further to your receipt of our client's letter dated 5 February 2009, there are various outstanding warranty claims in respect of the *ST Charlotte* which you have been requested to settle. You have been provided with full details and supporting documentation. We understand that you have failed to settle the same, notwithstanding your clear obligation to do so pursuant to Article IX of the Acquisition Contract. In fact, we understand that you have failed to respond to our client pursuant to their letter.

Our client should be grateful to receive your substantive response to their letter of 5 February, or, preferably, your settlement of sums due to them, as a matter of urgency. Kindly respond prior to 17:00 London time on Friday, 13 March 2009. If you are not prepared to consider our client's letter and settle its claim amicably, our client shall have little option but to commence formal arbitration proceedings against you pursuant to the terms of the Acquisition Contract.

We look forward to hearing from you.

Yours faithfully

*Norton Rose LLP*

Norton Rose LLP

DRD-#5186931-v1

Norton Rose LLP is a limited liability partnership registered in England and Wales with number OC328697.  It is regulated by the Solicitors Regulation Authority of England and Wales.  A list of the members of Norton Rose LLP together with those non-members who are designated as partners and their professional qualifications is open to inspection at its registered office, 3 More London Riverside, London, SE1 2AQ.  Any reference to a partner means a member of Norton Rose LLP or a consultant or employee of Norton Rose LLP or one of its affiliates with equivalent standing and qualifications.

Norton Rose LLP is a constituent part of Norton Rose Group, an international legal practice comprising Norton Rose LLP and its affiliates, with offices in Abu Dhabi, Amsterdam, Athens, Bahrain, Bangkok, Beijing, Brussels, Dubai, Frankfurt, Hong Kong, Jakarta*, London, Milan, Moscow, Munich, Paris, Piraeus, Prague, Riyadh*, Rome, Shanghai, Singapore, Tokyo, Warsaw.  *Associate office